# Richmond.

## RUSSELL v. THE COMMONWEALTH.

### January 31, 1884.

1. CRIMINAL PROCEEDINGS—*Appellate court.*—Objections to the introduction of evidence cannot be taken in the appellate court for the first time.

2. IDEM—*New trial.*—When some evidence has been given which tends to prove the fact in issue, or when the evidence consists of circumstances or presumptions, a new trial will not be granted merely because the court, if upon the jury, would have given a different verdict. To warrant a new trial in such cases, the evidence should be plainly insufficient to justify the finding of the jury. And this rule *a fortiori* applies to an appellate court. *Dean's Case*, 32 Gratt. 912.

3. IDEM—*Executioner.*—Under the statute the judgment in a criminal case will not be set aside because it fails to appoint an executioner of the sentence. Acts 1877–8, page 347, section 9.

4. IDEM—*Circumstantial evidence—Case at bar.*—The evidence which is circumstantial only, justified the verdict of murder in the first degree.

Error to judgment of circuit court of Lee county, rendered 6th April, 1883, on an indictment against Absolom Russell for the murder of Ira Thompson, alias Ira Dean, and sentencing him to be hanged.

On the night of the 19th July, 1882, Ira Thompson, alias Ira Dean, was murdered while asleep in bed. At the same time, in an adjoining room of the same house, his son, Floyd Dean, was severely wounded while in bed. Russell was son-in-law of the murdered man. The evidence was wholly circumstantial. To this judgment Russell obtained from one of the judges of this court a writ of error and *supersedeas.*

Opinion sets out the evidence.

*A. L. Pridemore* and *H. S. K. Morrison*, for the plaintiff in error.

*Attorney-General F. S. Blair*, for the Commonwealth.

LEWIS, P., delivered the opinion of the court.

After the verdict of the jury was rendered, the prisoner moved to set it aside as contrary to the evidence, but the motion was overruled, and the prisoner excepted.

The facts proved at the trial are embodied in the bill of exceptions, and are substantially as follows: That on the night of the homicide, the deceased, after having retired with his wife, and while both were in bed asleep, was struck on the head a heavy blow with some dull instrument, the character of the wound indicating that it was done with the pole of an axe, by which the skull was broken in, and from the effects of which he died on the next day. He remained unconscious from the time he was struck until his death. The day after the homicide the prisoner was arrested and held for trial. It appears that on several occasions prior to the homicide, the prisoner and the deceased became involved in altercations, and on one occasion in a fight, but that thereafter friendly relations between them were restored, and that the prisoner frequently visited the house of the deceased. The prisoner married a daughter of the deceased about six or seven years prior to the homicide, but had not visited the deceased for about two months previous to the homicide. They lived about three miles apart. A few weeks before the homicide William Russell, a brother of the prisoner, married a daughter of the deceased. The marriage, with which the deceased was displeased, took place at the prisoner's house. Soon thereafter, when the latter was informed that deceased was complaining of the marriage, he said that he didn't reckon Ira Dean

(meaning the deceased) would do any other way until his breath was stopped. At another time, the next day after the marriage, the prisoner, when apparently angry, said he had heard of Dean's saying he had already one d—d dog in the family and didn't want another, and that if he told him so he would mash his mouth. On the same day, at the house of a neighbor, he said that the deceased had met his (the prisoner's) little child in the road and passed on without noticing it; that he was as sorry a man as ever lived, and never mind, he would meet up with him some day. He also said he had heard that the deceased had rented Judge Morgan's land and was coming back there to live, but that he (the deceased) would never live *there* again, that was one thing *certain.*

The prisoner was at the time living on the land which he had heard the deceased had rented. On the day of the homicide, the prisoner applied to a land owner in the neighborhood to rent a place, saying he had to leave Judge Morgan's. On the evening of that day, he went to the house of the deceased and took supper with him and his family. After supper he went out into the yard, and stood with his foot on a log by which was the axe of the deceased, and there talked awhile with the deceased, asking him to go with him to Cumberland Gap to rent a farm. Deceased replied he could not go then, but would go the next week. The prisoner then left, saying he would get home before the moon went down. He went around the house towards a corn lot between the house and the main road *south* of the house, from which direction he had approached the house, and was met about one-quarter of a mile from the house in the main road going in the direction of home. The house of the deceased was a one-story house, containing two rooms, separated by a hall. On the night of the homicide, Floyd Dean, a son of the deceased, was lying in his bed in the room opposite to that in which the deceased

and his wife were sleeping.    He had not gotten into a sound sleep, but was dozing, when he was aroused by the opening of his door.    He turned his head, and saw a man approaching the bed.    By the light afforded by the moon he recognized him as the prisoner.    He was in the act of speaking to him when, standing at the head of the bed, he struck him a blow, which crushed out many of his teeth, and broke away a portion of the upper left jawbone.    He was rendered unconscious by the blow, and remained so until the next day.    About the same time the wife of the deceased was awakened by a sound which she thought was one of the children in her room falling out of bed.    She spoke to the deceased, but he did not answer.    She heard the door-knob rattle and some one running out of the house, and then along a plank on the outside of the house.    She was familiar with the step of the prisoner, and believed the steps she heard were his.    She lighted the lamp, and found the deceased bleeding and lying unconscious, with his face towards the wall, and in the condition already described.    The next day tracks were discovered leading from the *north* to the fence, about twenty feet from the house, apparently made by some one walking in a moderate gait, and other tracks were found just outside of the road going in the direction of the north farm-house, apparently made by some one running, as was indicated by the long distances between them.    The yard was sodded and did not show tracks, but outside of the yard tracks could be plainly seen, the earth being wet by recent rains.    A short distance from the house, and by the side of the tracks leading from the house, the axe was found which was by the log in the yard the evening before, and upon the handle were spots of blood.

The prisoner was sent for, and he and his wife came to the house of the deceased.    When arrested he showed no excitement or agitation, but took hold of his wife's hand and told her he was charged with killing her father, and

to stay right by him and answer no questions. Afterwards, when his wife was not present, he requested a young man to see his mother and tell her to stay with his wife, and not to allow her to answer questions. His shoes were taken off and fitted to the tracks on the north side of the house, and were found to fit them; the track made by the right foot accurately corresponding with his right shoe, which was a little turned to one side at the heel. When asked to take off his shoes he turned somewhat red and seemed embarrassed, and asked if some other way wouldn't do to measure the tracks. He hesitated a little as to which shoe to take off, raising first one foot and then the other. He offered no resistance, however, to taking them off, nor to his arrest.

These are substantially the facts upon which the verdict was rendered, which the judge who presided at the trial and saw the witnesses and heard them testify refused to set aside. And we are now asked to set it aside on the ground that it is not supported by the evidence.

The law relating to the granting of new trials is well settled and familiar. When some evidence has been given which tends to prove the fact in issue, or the evidence consists of circumstances or presumptions, a new trial will not be granted merely because the court, if upon the jury, would have given a different verdict. To warrant a new trial in such cases, the evidence should be plainly insufficient to warrant the finding of the jury. And this restriction applies *a fortiori* to an appellate court. *Grayson's Case*, 6 Gratt. 712; *Dean's Case*, 32 Id. 912.

We cannot say that the verdict in the present case is manifestly wrong, or unsupported by the evidence. On the contrary, it is plainly right and fully supported by the facts proved. The hostile feelings of the prisoner towards the deceased; his motive to slay him for the double purpose of gratifying those feelings and, perhaps, thereby of

preventing himself from being turned out of doors; his opportunity to commit the crime; the exact correspondence between the tracks discovered near the scene of the homicide and his own shoes, and his conduct immediately after his arrest, are all circumstances, together with those detailed by Floyd and Mrs. Dean, which point to him, and well nigh with absolute certainty, as the perpetrator of the crime for which he has been convicted.

It remains to say that the objection, for the first time made in this court, to the introduction of the evidence at the trial relating to the altercations between the prisoner and the deceased, several years before the homicide was committed, cannot be considered. It was introduced, without objection or exception, in the lower court, and it is now too late to urge the objection here.

The further objection that the judgment is erroneous because it failed to appoint an executioner of the sentence, is sufficiently answered by the statute (Acts of Assembly 1877–78, p. 347, § 9), which provides that when sentence of death is pronounced "the clerk of the court pronouncing such sentence shall, as soon as may be after the sentence, deliver a certified copy thereof to the officer of the said court, who shall cause the sentence to be executed."

There is no error in the record of which the prisoner can complain. He has been fairly and impartially tried; he has been found guilty by a jury of his peers, and must suffer the penalty of his crime. The judgment is affirmed.

JUDGMENT AFFIRMED.