# Richmond

ALEXANDER UPDIKE v. COMMONWEALTH OF VIRGINIA.

January 14, 1946.

Record No. 3017.

Present, All the Justices.

The opinion states the case.

*Eugene C. Hurt, Jr.,* and *A. H. Light,* for the plaintiff in error.

*Abram P. Staples, Attorney General,* and *M. Ray Doubles, Assistant Attorney General,* for the Commonwealth.

HOLT, J., delivered the opinion of the court.

On March 19, 1945, Alexander Updike was indicted for murder charged to have been committed on January 15, 1945. He was tried on that indictment on March 21, 1945, by a jury which found him guilty of voluntary manslaughter and fixed his punishment at three years' confinement in the penitentiary. That judgment is now before us on a writ of error.

On the afternoon of January 15, 1945, the accused went to Slaton's filling station located at Motley. Shortly there-after came Mott Short. These two drank some wine and beer there. Later, about seven o'clock in the evening came

Roger Wilkes. Wilkes said that at about nine o'clock, "I started up the road, and they said if I was going that way, they was going too." They overtook Wilkes, and the three of them went south along the paved road known as U. S. Highway No. 29. It had been raining some on that day together with traces of snow. Wilkes knew Updike but did not know Short. The three of them started to their several homes, taking with them some wine and a package, which Slaton gave to Short. Soon thereafter they stopped to take a drink, and it was then that Updike took from Short the package which Short was carrying and which Short claimed belonged to him. The ownership of this package, Wilkes said, was in dispute. He tells us what then occurred:

"Q. What did they do?

"A. Kept arguing on down the road a little ways. Then Mr. Updike, he reached over and got Short around the neck and Short told me to make him turn him aloose and I went over to make him turn aloose and he hit at me with something or another and I run down the road."

This is his account of what then occurred:

"Q. Did you see him hit Short?

"A. No, sir, I heard him hit him after I got down the road.

"Q. What did Short say?

"A. Short told him not to hit him.

"Q. Just what words did he use?

"A. He said, 'Oh, Lordy, don't hit me'.

"Q. And what did Updike say?

"A. I didn't hear him say anything.

"Q. About how far were you from them?

"A. About twenty steps, or somewhere along there.

"Q. What did you do then, or what did Updike do?

"A. I flashed the light to see where he was and he was standing in the road and he told me to wait for him.

"Q. Who?

"A. Updike.

"Q. Where was Short?

"A. I didn't see him nowhere."

Wilkes went south down the road from where this scuffle took place. Updike threw a stick at him and told him to wait. He did wait; Updike caught up with him and told him that he had a mind to kill him. Wilkes protested, drew a pistol and backed off a few steps, whereupon Updike said to him: " * * * he told me if I never would tell it he wouldn't kill me, so I promised him I wouldn't tell it." They then continued south on the main highway to the private road which led west to the Updike home. While on this private road Updike told Wilkes that he had had it in for Short for sometime but did not state the occasion for the grudge. They then parted. Updike went on home; he could not find the key, knocked his front door down and went in.

Next morning, Mr. Kelly Kattes, a brother-in-law of Updike, as he came down the road heard a groan and found Short. He was then unconscious; he lay with his head over towards the waterdrain, his feet three or four feet from the edge of the cement; his cap was about eight inches away with a hole cut in it, and his overalls were torn on the right leg from the waist to the knee. An ambulance was summoned, he was taken to a hospital and died without regaining consciousness.

The county coroner, Dr. H. H. Hammer, tells us the results of his examination:

"A. Well, he had an injury that extended from just above the right eye, six inches, I would say, more or less back along here (indicating). That started over the right eye and that hole extended on back into here, and brains were in there. You could see where some of them had come out, and you could stick a probe on down into where his brains were. Then there was an area about an inch and a half long by three-quarters of an inch wide that the whole area—both plates of the bone—were pushed down, and then that crack extended from there on back to approximately two more inches, and there were two little scratches on the back of his hand and an old scratch on his knee. The scratch on his knee was old.

"Q. And how long was this wound on his head?

"A. It was six inches long.

"Q. Was there any broken arms or broken legs or anything like that?

"A. No, sir.

"Q. Nothing had run over him or anything like that?

"A. No, sir."

Wilkes himself was afterwards arrested—maybe because he was suspected of being connected with this tragedy and maybe because he was carrying a concealed weapon. This was on the 18th of January. He made a statement in the presence of Sheriff Overbey, Deputy Sheriff Thomas and Updike, which does not differ materially from that testified to at the trial. Overbey told Updike that things looked bad for him and that if he wanted to make a statement he had better make it. He made no denial in detail but denied the substance of Wilkes' account of what had occurred.

For the defendant it is argued that Short was probably killed by a southbound truck. Updike said that he had had no dispute with Short about any bundle given to Short by Slaton; that he and Short were on the best possible terms and were second or third cousins; that he had no scuffle with him such as was reported by Wilkes and denied in greatest detail Wilkes' account of the struggle between him and Short. He said that Short left him where his road turned off and continued south on Route No. 29. There is a private road to Short's home running to the east, north of the Updike road which runs west, and about 200 feet south of where Short's body was found. There were no footprints around where the body lay. It is also true that there were tire marks which seemed to indicate that a truck going south swerved somewhat to the west and ran off on the road shoulder near it.

Ross Rorer is a police officer of Pittsylvania county. On Thursday, the 18th of January, he took Wilkes to where the body was found. He then saw no signs of a scuffle on the road, either by Short or any one else. He said that Wilkes told him he last saw Short where he and Updike turned

to the right to go up toward the Updike home, and that Short left them at this intersection and proceeded south on the main highway; and that Wilkes on this occasion said that this was the first that he knew about the tragedy.

Paul Pickeral, a witness for the defendant, said that there was a mark on the hard surface of the highway which seemed to show that a body had scoured along it.

A stick was found in the honeysuckle vines on the road shoulder near where Wilkes said it was thrown. It was examined by an expert chemist, who found on it no trace of blood.

Upon motion to strike the evidence, Judge Whittle said:

"The motion will have to be overruled. If the jury believe the evidence of this witness Wilkes they can convict this man. If they don't believe Wilkes they should acquit him. That is the sole issue in the case." .

It is possible that one walking down the road may be struck on the top of his head by a truck, may suffer a broken skull with a narrow wound six inches long and be thrown from the paved surface to a roadshoulder with no other injury to the body, but it is not probable. We have seen that Updike said that Short left them and continued south beyond the junction of his by-road with the highway. This was south of the road to the east which led to the Short home and south of where the body was found. Why Short, who had started home, did this is not explained. It is also said that still farther south were found spectacles which Short's sister thought belonged to him, but his brother-in-law thought not.

Where one's skull is broken by a blunt instrument, traces of blood may attach, but that is not necessarily true.

If Wilkes' statement to Rorer that Short went south beyond the Updike road be true, then Updike is not guilty, for that statement is in direct conflict with the testimony which Wilkes gave at the trial. Wilkes' explanation is that he was scared, frightened by Updike's threat.

This conflict of evidence was for the jury. It might

have accepted the witness' explanation, or it might have rejected it.

In *Richmond-Washington Motor Coaches* v. *Austin*, 154 Va. 148, 152 S. E. 357, this court, speaking through Judge Campbell, said:

"In *Southern Ry. Co.* v. *Cash*, 110 Va. 282, 284, 65 S. E. 601, 602, Judge Buchanan said: 'The court cannot invade the province of the jury on a motion for a new trial, by attempting to pass upon the credibility of the witness, to reconcile conflicting statements, or to determine the weight to be given the evidence of each. If there are conflicts or discrepancies in the evidence it is the jury's province to reconcile them if possible, and, if not, the jury may give credence to the witness or witnesses who in their opinion are best entitled to it. 1 Thompson on Trials, section 1038.

" '*Chesapeake, etc., Ry. Co.* v. *Williams*, 108 Va. 689, 62 S. E. 796, and cases cited.' "

See also, *Tignor* v. *Virginia Elec., etc., Co.*, 166 Va. 284, 184 S. E. 234.

In *Massie* v. *Commonwealth*, 140 Va. 557, 125 S. E. 146, we said:

"In *Johnson's Case*, 29 Gratt. (70 Va.) 796-817, this court approved the doctrine that where the evidence leaves it indefinite which of several hypotheses is true, or establishes only some finite probability in favor of one hypothesis, such evidence cannot amount to proof, however great the probability may be."

In *Bristow* v. *Brauer*, 175 Va. 118, 7 S. E. (2d) 93, we said:

"If a condition of facts is such that the jury may deduce from them more than one inference or conclusion, the court, upon a motion to set aside their verdict * * * has no such discretion, but is bound down to that interpretation of the facts, and is constrained to adopt that conclusion from the evidence, which the jury have sanctioned by their verdict."

For the defendant it is said that it was just as possible

that Short was killed by a truck as by some other agency and that a conviction cannot be left to guesswork. Dealing with this contention, the court, in its instruction, said:

"The court instructs the jury that if they believe that the evidence in this case is equally susceptible of two or more interpretations, one of which interpretations points to the guilt of the accused, Alexander Updike, and the other interpretation, just as reasonable, points to the innocence of the accused, Alexander Updike, then it is the duty of the jury to accept that interpretation pointing to the innocence of the said Alexander Updike and give said Alexander Updike the benefit of the presumption of innocence and find the said Alexander Updike not guilty."

It is true that in *Massie v. Commonwealth, supra*, it is held that there can be no conviction where the evidence leaves it indefinite which of several hypotheses is true. And to the same effect is *Harrison v. Commonwealth*, 183 Va. 394, 32 S. E. (2d) 136. But that is not this case. Hypotheses give place to evidence. If we are to believe Wilkes, he left Updike and Short struggling. He heard blows, and he heard Short cry out; and he heard Updike threaten him if he ever told.

█ █ It is said that *corpus delicti* has not been proven. The death of Short and the manner in which it came about is not in dispute. Of course the identity of the criminal agent may be established by circumstantial evidence. Eyewitnesses are not often present.

There is no reversible error in the record.

*Affirmed.*