# Staunton

JOE LEIGH v. COMMONWEALTH OF VIRGINIA.

September 5, 1951.

Record No. 3835.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Fred B. Greear* and *L. M. Robinette,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

HUDGINS, C. J. delivered the opinion of the court.

Joe Leigh seeks by this writ of error to reverse a judgment entered on a verdict convicting him of second degree murder for killing John Miller and fixing his punishment at 15 years confinement in the State penitentiary.

At the threshold of the case we are confronted with a motion by the Commonwealth to dismiss the writ of error because it is alleged defendant failed to file his notice of appeal and assignments of error within sixty days after entry of the final judgment, as required by Rule 5:1 § 4.

The motion to set aside the verdict was overruled and final judgment entered July 14, 1950. The notice of appeal and assignments of error were marked filed September 19, 1950, seven days after the lapse of the sixty-day period. Ordinarily, the date of filing noted by the clerk on papers filed in his office is conclusive.

The deputy clerk, Nanetta Ely, who received in the clerk's office the transcript of the evidence and the notice of appeal and

assignments of error, is uncertain just when the notice of appeal was filed. She states in her affidavit that she marked the transcript of the record filed September 4, 1950, and if she received the notice of appeal and assignments of error on or about the same date, the notice of appeal and assignments of error should have been marked "filed September 4, 1950." She adds: "It could be that I did not mark it filed the day it was received and afterward, in getting the papers together preparatory to making up the original record to be sent to the Supreme Court, I might have noticed that the Notice of Appeal had not been marked filed and accordingly marked it filed on that date," to-wit: September 19,1950.

Mr. Lloyd M. Robinette, one of the attorneys for defendant, stated in his affidavit that while he did not remember the exact date on which the notice of appeal and assignments of error were filed, he did remember that he went over the notice with Fred B. Greear well within the sixty-day period and that Mr. Greear left his office with copies of the notice of appeal and assignments of error with the express purpose of having Mr. Glen M. Williams, the Attorney for the Commonwealth, acknowledge legal service.

Mr. Williams stated that he did not remember the exact date the notice of appeal and assignments of error were brought to him, but he did remember accepting service and endorsing thereon "legal and timely service accepted," and that if the notice of appeal and assignments of error had not been presented to him within the time prescribed by the rules he would not have accepted service.

Mr. Fred B. Greear, of counsel for defendant, stated that he clearly recalled going over the notice of appeal and assignments of error with Mr. Robinette in the latter's office on a date well within the sixty-day period; that he went from Mr. Robinette's office directly to the office of Mr. Williams, where Mr. Williams acknowledged service, after which he walked from Mr. Williams' office across the hall to the clerk's office and gave the notice of appeal and assignments of error, with the acknowledgment of service thereon, to Miss Nanetta Ely, deputy clerk, and directed her to file them with the papers in the Leigh case.

We have the affidavits of two reputable attorneys representing the defendant, and the Attorney for the Commonwealth, stating positively that the notice of appeal and assignments of error were presented to opposing counsel, who acknowledged

service well within the sixty-day period. Mr. Greear swears that on the same day and immediately after the Attorney for the Commonwealth had acknowledged service of the notice of appeal and assignments of error, he walked across the hall and filed the paper in the clerk's office. The deputy clerk, in her affidavit, virtually acknowledges that she made a mistake in the date of filing of the notice.

These uncontradicted facts compel a different conclusion from that reached in *Skeens* v. *Commonwealth, ante,* p. 200, 64 S. E. (2d) 764, and *Avery* v. *County School Board, ante,* p. 329, 64 S. E. (2d) 767, and *Hall* v. *Hall, post,* p. 721, 66 S. E. (2d) 595.

■ Defendant, in order to obtain a review by this court, complied with every requirement prescribed by the rules of Court. He should not be denied a review simply because of an error made by a ministerial officer of the court. The motion to dismiss is overruled.

Defendant moved the trial court to set aside the verdict on the ground that the evidence was insufficient to sustain it. This action of the court is, in effect, the basis of defendant's first four assignments of error.

The evidence for the Commonwealth and for the defendant is in conflict on several material points. Therefore, under familiar rules, we must consider the evidence in the light most favorable to the Commonwealth, the successful litigant in the trial court.

Joe Leigh was 51 years of age and, at the time of the homicide, weighed approximately 210 pounds. He had served several months as a police officer in the town of St. Charles. In 1942, and for several years thereafter, he had operated a restaurant in the town. During this period he was married and living with his wife, Maude Leigh. While operating the restaurant he employed Lorene Miller as a waitress. When employed she was only 14 years of age, but she told defendant she was 16. Defendant and Lorene became infatuated with each other and in 1948 Lorene gave birth to a baby boy whom defendant acknowledged to be his child.

On December 6, 1948, Maude Leigh obtained a divorce *a vinculo matrimonii* from defendant. On January 28, 1949, defendant and Lorene Miller were married in Harlan county, Kentucky. They returned to St. Charles where they lived together as husband and wife until the spring of 1949. On June

13, 1949, defendant obtained a divorce *a mensa* from Lorene on the ground of desertion. Subsequent to the entry of this decree defendant and Lorene cohabited at various times. They spent several nights together in the home of Mrs. Roy Hall, sister of John Miller's wife. About a week or ten days prior to the homicide they slept together in the home of John and Ellen Miller, parents of Lorene.

Lorene testified that after the divorce proceedings were instituted defendant told her that he had abandoned them. Relying upon this statement, she slept with him several times after June 13th. Shortly after they had slept together in the home of her parents she saw the divorce papers in the glove compartment of defendant's car and for the first time learned that he had obtained a divorce. She did not cohabit with him after obtaining this information.

John Miller was 51 years of age, 6 feet tall, and weighed approximately 220 pounds. He and his family, consisting of his wife, Ellen Miller, four children, John Miller, Jr., a son 23 years of age, Lorene Miller, 21 years of age, and her baby, Doris Miller, 14 years of age, and a younger daughter, Glenda Kay Miller, lived a quarter of a mile beyond the corporate limits of the town of St. Charles, in a four-room, one-story house located on the side of the railroad right of way. The only street or drive way to the house was a lane leading from the main traveled road and ending on the opposite side of the railroad. There was a foot path leading from the end of the lane across the right of way to the Miller house.

On July 9, 1949, defendant made three trips to the Miller home. The first trip was between 1:00 and 2:00 p. m., at which time he saw Mrs. Miller, her son and two daughters, Lorene and Doris. He played with his baby a few minutes and left without any unpleasantness. Two to three hours later, when he returned he appeared to be drinking. He went into the bedroom, picked up his baby and brought it into the living room, where he was throwing it over his head. The baby began to cry and scream. Lorene took the baby and carried him into the kitchen where defendant followed her. Defendant threatened Lorene's life, whereupon she took the baby and hurried out of the house. As she was leaving, defendant called her "to come here," but she continued on her way. About this time defendant picked up a white china dog and said: "Kill that God damned bitch." Ellen

Miller advised her daughter to take the baby and get away from the house, because said she, "he (defendant) aims to hurt some of us."

After Lorene had gone Ellen Miller asked defendant to leave. According to her testimony, she said: "Joe, why don't you leave? What have we done that you want to act like this? Lorene is staying here and not bothering you. He cursed and said, 'God damn you, I don't have to leave.' I said, 'If you don't leave, I'll call the law.' I took up the receiver and started to look for Charley Redman's (police officer) number." Defendant knocked the telephone directory out of her hand, with the statement, "You are not going to call any God Damn law on me." He then shoved Mrs. Miller and she fell back on the couch. Mrs. Miller began to scream, picked up the telephone again and started to telephone her sister, Mrs. Roy Hall. Defendant again interfered. Mrs. Miller, at the urgent request of her daughter, Doris, dropped the telephone, continued to scream and went out the back way to the home of Mrs. Collins. A few minutes thereafter defendant left the house. Mrs. Miller knowing that her husband was at the home of Mrs. Hall, sent her daughter, Doris Ann, in a taxicab for him. When Doris got in the cab she was crying and continued to cry until she reached the home of Mrs. Hall where she told her father what had happened. He, Jerry Hall, 15 year old son of Mrs. Hall, and Doris, returned to the Miller home in the taxicab.

On their arrival, Mrs. Miller told her husband of the disorderly conduct of defendant, stating that "Joe come up here and hurt my arm * * * shoved me down, and he took the telephone away from me," and ran Lorene and the baby away from home. Miller immediately telephoned W. P. Bays, the sheriff of Lee county, who lived at Jonesville, and was advised by him to get a criminal warrant for defendant. Acting on this advice Miller and Jerry Hall went to the town of St. Charles and secured a warrant. Being unable to find a police officer to serve it, he, with Jerry, returned to his home where he again called the sheriff who told him that he would send one of his deputies to get and serve the warrant.

A few minutes after this telephone conversation with the sheriff Mrs. Miller saw Maude Leigh sitting in defendant's car where it was parked across the railroad tracks, and defendant walking across the tracks toward her home. She became

frightened and said to her husband "I'm afraid if he (defendant) comes in here he will raise trouble and you have no protection, and I said let's leave the house." She and her two daughters, Lorene and Doris, persuaded Miller to leave and go to the home of Mr. Collins, a neighbor living next door. After they saw defendant enter their home John Miller said: "I am going back out there I want to talk to him like a man and see if he won't leave." Within a few minutes after Miller returned to his home Mrs. Miller and her daughters heard three shots and ran to their home where they found Miller stretched out on the floor apparently dying from gunshot wounds. Other witnesses testified that after the shooting defendant left the house, got in his car and drove away.

It is well settled law in this jurisdiction that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon slight provocation, is *prima facie* willful, deliberate and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances.

Every homicide is presumed to be murder in the second degree, and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth, and the burden is on the accused to reduce the offense from murder in the second degree to manslaughter or excusable or justifiable homicide. *Smith* v. *Commonwealth, ante,* p. 186, 64 S. E. (2d) 761, and *Callahan* v. *Commonwealth, ante,* p. 26, 63 S. E. (2d) 617.

The Commonwealth relied not only upon these presumptions, but upon the testimony of Jerry Hall, the fifteen-year old nephew of Mrs. Miller, who testified that when Miller, his wife and daughters left their home, he started to his home, but it began to rain and he returned and was sitting on the porch when defendant came up and entered the house without speaking to him. After defendant had been through the house he came back and asked Jerry "where is everybody?" As the wind began to blow the rain on the porch Jerry and defendant went into the living room and were standing there when Miller entered the same room from the back bedroom door and asked defendant "what he meant by shoving his wife around and running his kids off." Defendant replied "By God what do you care?" and jumped at John and grabbed him around the waist. "John * * * got him

around the neck.'' A few moments later Hall saw defendant ''pull the gun and stick it up to John's left side and I started for the door and I heard a shot and I looked back and I saw John with the knife and I run over on the railroad.'' He also testified that he heard the first shot as he was going down the steps and as he reached the yard gate he heard two more.

This testimony, without more, proves that defendant, armed with a deadly weapon, made an unprovoked, vicious attack upon Miller in his home. It tends to establish murder in the first degree depending upon the nature of the attack. However, it is unnecessary to decide whether this evidence would sustain a verdict of murder in the first degree, as the jury found him guilty of murder in the second degree, which, in effect, acquits him of any greater offense.

Defendant's evidence presents quite a different picture. His testimony was corroborated in several particulars by a number of witnesses. He testified that on the day of the homicide, he was not drunk or drinking. His first visit to the Miller home was to see his baby boy. While there Lorene asked him for money for the baby. At the time he had no money in his pocket. His second visit was for the purpose of giving Lorene $20.00, $10.00 for herself and the baby, and $10.00 for her mother. On her request he did not then give her the money because she told him that if he would come back before the stores closed she could tell her mother she wanted to get something for the baby which would give her an excuse to go riding with him. He denied that he threatened Lorene or cursed Mrs. Miller. He admitted that he petted Lorene, to which Mrs. Miller objected, and that he took the telephone away from her when she threatened to call the police. His third trip to the Miller home was made in response to a message which Lorene had given Charles Mosley over the telephone to the effect that the baby was sick and she wanted defendant to take him to the doctor.

Charles Mosley testified that while sitting in the mayor's office the telephone rang and, on request of Clint Hughes, a police officer, he answered the telephone. The person on the other end told him that she was Lorene Miller and asked him to deliver the message to defendant. Within thirty minutes thereafter he saw defendant driving his Hudson automobile up the street, with Maude Leigh riding with him. He stopped them and told defendant what Lorene had said.

Defendant testified that after talking to Charles Mosley he immediately drove to the Miller home, went through the house and found no one at home. After he had passed the center of the living room on his return from the back of the house to the front porch, and before he saw any one, Miller grabbed him around the neck with his left hand, holding a knife in his right hand, and said: "I will cut your God damn head off while I have a chance." As defendant wheeled, the force of Miller's attack bent him down towards the floor. While in this position and as Miller was cutting him with the knife, he pulled his gun and shot three times. The first shot was made from a stooping position and while Miller's body was over him. The other two shots were made after Miller had straightened up. Miller cut him two or three times before he fired the first shot. These cuts were described by Dr. J. H. Dellinger as follows:

Defendant "was suffering from knife wounds on the left side of his neck and face. One wound started nearly back of the center of his neck and came around under the ear to a point on his jawbone, this wound was approximately seven inches in length. The other wound started at the base of the neck and extended up and forward intersecting the first wound and running out into the left jaw. This second wound was much more dangerous than the first in that it traversed the area in which is located the jugular vein. This wound extended nearly to the jugular vein and if it had gone a bare fraction deeper would have severed that vein and caused the death of Mr. Leigh.

"Leigh was also suffering with a stab wound in his right hip. This wound was deep and the knife blade had apparently struck the bone as it was a long time in healing up and gave a great deal of trouble."

Defendant said that he did not know just when the stab in the hip was inflicted. He said Miller "had me bent down almost to the floor, and whoever it was behind me jerked my head back like that and I had to turn this way to get my gun and just as I got my gun out I shot. At the first shot he straightened up and as I came up I shot two more shots and pushed him over with my left hand and he fell."

The course of each of the three bullets through Miller's body as described by Dr. T. S. Ely, the coroner, and Clyde Copeland, the undertaker, witnesses for the Commonwealth, tends to support defendant's testimony as to his position at the time he fired

the fatal shots. The witnesses said one bullet entered the body just below the first rib on the left side and apparently ranged up to or through the back of the heart and came out over the right clavicle.

A second bullet entered the left side about 2 inches above the crest of the hip and passed through the body coming out on the right side about 3½ inches above the crest of the right hip. The third bullet entered the left side five inches above the crest of the hip, slightly to the back, and remained in the body. In addition to the wounds from the bullets there were minor cuts on the face, neck, chest and abdomen, and lacerations over the left eye two inches long.

Defendant further testified that his personal relations with Miller had been friendly, and so far as he knew neither had any ill-feeling toward the other. After the killing defendant was informed by several parties that Miller had made threats against his life. These witnesses were called and testified that they had heard Miller say "He (defendant) tore up my family, I am going to kill him the first chance I get, and I may make a chance to kill him." Four witnesses testified that approximately an hour before the killing, they saw Miller on the street in St. Charles, near the barber shop, where he pulled a paper out of his pocket and said: "This is a warrant for Joe Leigh but it will never be served on the God damn son of a bitch if I can get him at the right place."

We have stated somewhat in detail the evidence for the Commonwealth and defendant in order to emphasize the fact that it cannot be reconciled, and that this court is again confronted with a situation similar to that presented in *Southern Ry. Co.* v. *Cash,* 110 Va. 282, 65 S. E. 601, where Judge Buchanan, speaking for the court said:

"The court cannot invade the province of the jury on a motion for a new trial, by attempting to pass upon the credibility of the witness, to reconcile conflicting statements, or to determine the weight to be given the evidence of each. If there are conflicts or discrepancies in the evidence it is the jury's province to reconcile them if possible, and, if not, the jury may give credence to the witness or witnesses who in their opinion are best entitled to it."

Mr. Justice Spratley, speaking for the court, in *Bristow* v. *Brauer,* 175 Va. 118, 123, 7 S. E. (2d) 93, quoting with approval

from the opinion of the trial judge, the late Frank T. Sutton, Jr., said: " 'If a condition of facts is such that the jury may deduce from them more than one inference or conclusion, the court, upon a motion to set aside their verdict * * * has no such discretion, but is bound down to that interpretation of the facts, and is constrained to adopt that conclusion from the evidence, which the jury has sanctioned by their verdict.' ''

Judge Lewis, in *Russell* v. *Commonwealth,* 78 Va. 400, 404, stated the same principle in the following language:

"The law relating to the granting of new trials is well settled and familiar. When some evidence has been given which tends to prove the fact in issue, or the evidence consists of circumstances or presumptions, a new trial will not be granted merely because the court, if upon the jury, would have given a different verdict. To warrant a new trial in such cases, the evidence should be plainly insufficient to warrant the finding of the jury. And this restriction applies *a fortiori* to an appellate court." See *Grayson* v. *Commonwealth,* 6 Gratt. (47 Va.) 712; *Pryor* v. *Commonwealth,* 27 Gratt. (68 Va.) 1009; *Dean* v. *Commonwealth,* 32 Gratt. (73 Va.) 912; *McDaniel* v. *Commonwealth,* 183 Va. 481, 32 S. E. (2d) 667; *Updike* v. *Commonwealth,* 184 Va. 862, 36 S. E. (2d) 519; and *Toler* v. *Commonwealth,* 188 Va. 774, 51 S. E. (2d) 210.

Defendant also contends that the trial court committed error in instructing the jury on murder in the first and second degrees.

The trial court gave twenty-two instructions that covered fully and fairly every phase of the case presented by defendant as well as by the Commonwealth. The above summary of the evidence for the Commonwealth, reveals, without the necessity of further discussion, that the jury should have been instructed on the two degrees of murder. The evidence in this case is quite different from that for the Commonwealth in the cases cited and relied upon by defendant to support his contention. We find no error in giving or refusing instructions.

Defendant's next contention is that Lorene Miller (sometimes referred to as Lorene Miller Leigh) was not a competent witness for the Commonwealth, and that the court committed reversible error in permitting her to testify against him.

Defendant argues that he is entitled to the benefit of Code, sec. 8-288, which provides that in a criminal case neither husband nor wife shall be permitted, without the consent of the other, to

testify against the spouse charged with a criminal offense committed against a third party.

Defendant concedes that the purported marriage on January 28, 1949, between him and Lorene Miller was void, but he contends that the provisions of the statute should be extended so as to protect parties who, in good faith, believed such a marriage to be valid, and acting on that belief lived together as husband and wife.

The first paragraph of section 2230 of Wigmore on Evidence, 3d Ed. pp. 232, 233, is quoted to support this contention. This paragraph, considered alone, seems to sustain defendant's position, but when read in connection with the other paragraphs of the same section, it clearly appears that the construction claimed by defendant was not that intended by the learned author. The entire section is as follows:

"The policy of the privilege, whatever it may be, applies at any rate to those only who profess to maintain towards each other the legal relation of husband and wife. There is therefore no privilege to withhold the testimony of a mere *paramour* or mistress.

"Furthermore, the lofty object of protecting from invasion the sanctity of marital peace is deemed to extend to those only who legally and technically *are* husband and wife, whatever their honest and innocent belief may have been as to the validity of their relation. Hence there is no privilege to persons whose marriage is *void;* their domestic peace may be shattered at any litigant's discretion.

"Again, as the innocent unmarried are not deemed to deserve the benefit of the rule, so too, conversely, its benefits are gained by the ingenious wrongdoer who brings himself within its formal terms by marrying the witness *after service of subpoena* and thus creating 'ad hoc' a domestic peace which is to be jealously safe-guarded."

The general rule, namely: a party cannot claim the benefit of the privilege in question, unless the parties were legally married, is recognized and followed in practically all jurisdictions. See *Corvin* v. *Commonwealth*, 131 Va. 649, 108 S. E. 651, 39 A.L.R. 592.

There is no merit in this contention.

After the jury had returned its verdict and while the case was pending in the trial court on a motion to set it aside, de-

fendant filed an additional motion for a new trial on the ground of after-discovered evidence.

Two witnesses stated in separate affidavits that some time after the verdict had been returned, and before the court had passed on the motion to set it aside, while discussing the case with Guy Hartley, one of the jurors, Hartley said he "would not believe Wright Doss, (one of the witnesses introduced by defendant) it made no difference what he had sworn," and that "Wright Doss had stolen everything that V. I. C. had and they caught him with an anvil * * * on top of the mountain, and they made him bring it back."

■ Doss was one of six witnesses who testified that prior to the killing they had heard John Miller threaten to kill Joe Leigh because of the trouble that he had given his family. This juror may not have believed the testimony of Doss, but there is nothing to indicate that he did not give due consideration to the testimony of the other five witnesses who said that they had heard Miller make similar threats against defendant.

A juror may disbelieve a witness for any one or more of many reasons, but such disbelief by one juror is no ground for disturbing the verdict. In a great many cases, witnesses contradict each other and give different versions of the same incident. The jurors must accept or reject the testimony of one or the other of such witnesses. The peculiar function of a jury is to settle issues in dispute. Jurors are not required to give reasons for accepting the testimony of one witness and rejecting that of another. Simply because a juror dislikes or does not believe the testimony of one witness is no evidence tending to show that he is prejudiced against the defendant. Indeed defendant cites no authority to support this contention.

Defendant filed separate affidavits of three persons, in each of which it is stated that in December, 1949 (more than six months before the trial) at Lee Cafe in St. Charles, Virginia, each of them heard John Blevins ask Lorene "what she thought they would do with Joe Leigh * * * for killing her father." Lorene replied: "I don't know * * * but I will tell you the truth about it, if it was left up to me they would do nothing about it, for I was the cause of all of it, I called Joe up there. I can't tell the truth about it on account of my mother, for I would have no place to go and my mother would run me off." It is also stated that she said "it would work out some way."

■ These statements consist of an opinion, statement of fact, and a willingness to give biased or perjured testimony. Of course, the opinion of a witness, not an expert, is not admissible. The fact that Lorene telephoned Joe to come to the home was proven by the uncontradicted testimony of three witnesses. Lorene neither denied nor affirmed that she had telephoned him that the baby was sick and she wanted defendant to take him to a doctor.

If the remaining portion of the alleged statement may be considered as an expression of a willingness on the part of Lorene to give biased or false testimony against defendant, it is nothing more nor less than an extrajudicial declaration of one witness for the Commonwealth, and if her entire testimony be eliminated or disregarded, the testimony of three additional witnesses would be sufficient to support the verdict. If the affiants had been introduced and testified as to the statements they heard Lorene make, the court would have been compelled to instruct the jury that it could consider such testimony only for the purpose of impeachment,—that is, the statements were admissible for the sole purpose of discrediting the testimony of Lorene. They could not be regarded as substantive evidence on the merits of the case.

■ The general rule is that if, eliminating the perjured evidence, there is still other evidence sufficient to support the verdict, a new trial will not be granted. *Powell* v. *Commonwealth*, 133 Va. 741, 112 S. E. 657, 33 A. L. R. 541.

Application for a new trial is addressed to the sound discretion of the trial court and is based on the ground that there has not been a fair trial on the merits. The newly discovered evidence in question does not meet two of the four essentials required to sustain a motion for a new trial, namely: such evidence must be material in its object, and as such on another trial ought to produce opposite results on the merits. * * * It must not be merely cumulative, corroborative or collateral. Burks Pleading & Practice, 3d Ed. sec. 297, p. 536.

We find no reversible error in the rulings of the trial court and the judgment complained of is

*Affirmed.*