COURT OF APPEALS OF VIRGINIA


Present:  Judges McClanahan, Petty and Senior Judge Fitzpatrick
Argued at Alexandria, Virginia


TRACY HENSLEY

v.      Record No. 0129-07-4

CULPEPER COUNTY DEPARTMENT                    MEMORANDUM OPINION* BY
  OF SOCIAL SERVICES                           JUDGE WILLIAM G. PETTY
                                                 DECEMBER 4, 2007
LESLIE NEIL MILES

v.      Record No. 0657-07-4

CULPEPER COUNTY DEPARTMENT
  OF SOCIAL SERVICES


               FROM THE CIRCUIT COURT OF CULPEPER COUNTY
                     J. Howe Brown, Jr., Judge Designate

          Christian A. Brashear for appellant Tracy Hensley.

          V. R. Shackelford, III (Shackelford, Thomas & Gregg, P.L.C., on
          briefs), for appellant Leslie Neil Miles.

          Robert F. Beard for appellee.

          J. Michael Sharman (Commonwealth Law Offices, P.C., on brief),
          Guardian *ad litem* for the minor children.**


        In these appeals, parents, Tracy Hensley ("mother") and Leslie Miles ("father"), appeal

the trial court's decision terminating their residual parental rights to three of their children,

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        ** The guardian *ad litem* filed a brief adopting the arguments of Culpeper County
Department of Social Services, and asserting that CDSS met its burden of proof under Code
§ 16.1-283, by clear and convincing evidence. The guardian *ad litem* also appeared at oral
argument and argued the merits of the appeal on behalf of the children.

pursuant to Code § 16.1-283(C)(2).[1]  On appeal, they argue the trial court erred in ruling that:

1) the foster care plans were timely filed as required by Code § 16.1-283; 2) the Culpeper County

Department of Social Services ("CDSS") met its burden of proof under Code § 16.1-283, by

clear and convincing evidence; and, 3) the failure of CDSS to timely pursue termination petitions

did not prejudice their parental rights.  Having concluded that the trial court did not err, we

affirm the judgments of the trial court.

## I.  BACKGROUND

We view the evidence in the "'light most favorable' to the prevailing party in the circuit

court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'"

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005)

(quoting Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460,

463 (1991)).

The parents have four children:  R.M., a six-year-old boy; S.M., a four-year-old girl;

A.M., a two-year-old girl; and B.M., a ten-month-old boy.[2]  In June 2005, CDSS removed R.M.,

S.M., and A.M. and placed them in foster care.  Later that year, mother gave birth to B.M.  B.M.

remains in the custody of his parents, under a protective order with CDSS.

Circumstances Surrounding
Placement of the Children in Foster Care

On June 2, 2005, R.M. arrived at school with red marks or "petechiae and pattern bruises

around his neck."  When school officials inquired about the cause of his injuries, R.M. "put his

hand up to his neck and said, 'Mommy did it.'"  When asked for additional details, R.M. refused

---

[1] Because the two appeals involved similar factual and legal issues, we consolidated the appeals for purposes of oral argument and for the purposes of this opinion.

[2] These were the children's ages at the time of the termination proceedings in the circuit court in September 2006.

to discuss it and explained, "Mommy told me not to talk about it." School officials then contacted CDSS, and R.M. was taken to the emergency room. The doctor confirmed the presence of petechiae and old ecchymosis[3] around R.M.'s eyes and neck and diagnosed him with "possible child abuse."

The Medical Director of the Pediatric Forensic Assessment and Consultation Team at Inova Fairfax Hospital examined photographs of R.M.'s injuries and opined that: "the bruises were highly compatible with choking or strangulation . . . indicative of strangulation induced with the hands and not indicative of slap or ligature marks."

In December 2005, father and mother entered guilty pleas to misdemeanor child neglect for charges arising from this incident. They were convicted and sentenced to twelve months in jail, with ten months suspended, and one year of supervised probation.

As a result of the June 2005 incident, R.M. was removed from the home and adjudicated an abused and neglected child. Ten days later, CDSS also removed S.M. and A.M. from their parents. The court adjudicated the girls as at risk of being abused or neglected based upon a stipulation of the parties and the adjudication of R.M. Both girls received medical care upon removal and were diagnosed with "neglect." Neither child was current with her vaccinations. In addition, A.M. had missed her previous four medical appointments.

At the time of foster care placement, S.M. suffered from regular nightmares and would wake up from the nightmares frequently, saying, "Stop Mommy, stop Mommy." Her foster mother described S.M. as "very emotionally distraught," and she required counseling for her emotional problems. Her foster mother testified at trial that "[w]e are getting to where we have more better days than bad days."

---

[3] Ecchymosis is "the escape of blood into the tissues from ruptured blood vessels marked by a livid black-and-blue or purple spot area." Webster's Third New International Dictionary 718 (1981).

- 3 -

When A.M. first arrived at the foster care home, she could not hold her head up, was underweight, and suffered from a "horrible diaper rash." She had a partially collapsed lung, or minimal atelectasis, consistent with "prolonged periods in a car seat."[4] After fifteen months in foster care, A.M.'s physical condition had greatly improved, and her foster mother described A.M. as a "very thriving" and "happy little girl" who plays with the other siblings in the foster care home.

Because R.M. displayed "aggressiveness" towards S.M., CDSS placed R.M. in a different foster home. The first placement for R.M. did not work, and R.M. was placed in a second foster home. When he first arrived at his second foster home, he did not want any physical contact with his foster parents and would pull away if they touched him. By the time of trial, he attended regular counseling sessions, had become more affectionate with his foster family, and was involved in T-ball, camping and other activities with the other boys in the foster family.

<u>Foster Care Service Plans</u>

On August 23, 2005, the juvenile and domestic relations district court (J&DR) approved the initial foster care service plans for the children with a goal of "return home." The plans set out various services offered to the family by CDSS, along with responsibilities of the parents.

The initial plans required that the parents: 1) maintain a relationship with their children and display appropriate behavior during visitations; 2) obtain a parental capacity evaluation and referral for counseling and mental health resources; 3) participate in anger management classes to learn new techniques for handling frustration; 4) participate in a referral for psychological evaluation to determine further services necessary to support the family and to address parenting

---

[4] At trial, mother denied that A.M. spent most of her time in a car seat and added, "If her lung were [sic] as bad as they said it was, then the doctors would have done something about it."

issues; 5) obtain an individual substance abuse evaluation; 6) complete a parenting class; and, 7) pay child support.

<u>Disapproval of Foster Care Service Plan; Change in Goal;<br>Termination Proceedings</u>

At a hearing on February 9, 2006, the J&DR disapproved the foster care plans and directed CDSS to file new plans. The order provided that "visitation is in the discretion of CDSS." In April 2006, CDSS ended the visits between the parents and the children. Meanwhile, CDSS filed petitions to terminate the parents' parental rights. These petitions were later dismissed without prejudice for failure to file proper foster care service plans.

CDSS filed foster care service plans with the goal of "adoption." On July 13, 2006, CDSS filed petitions to terminate the parental rights of father and mother, and on August 11, 2006, the J&DR terminated their rights under Code § 16.1-283(B) & (C)(2).

The parents appealed to the trial court, and a *de novo* trial was held on September 22, 2006. In a motion to strike, they argued that the foster care plans were not timely filed because none of the plans contained a date stamp confirming that the plans were filed prior to the filing of the petitions to terminate the parental rights. Before ruling, the trial court heard testimony from two witnesses concerning the filing of the foster care service plans. Janet Brown, Clerk of the J&DR, testified that, "[g]enerally, it's the top, the transmittal [form] [that] is stamped, not the actual plan." The original court files for A.M. and S.M. contained transmittal forms bearing file stamps of June 22, 2006. The original court file for R.M. did not contain a transmittal form.

Kathy Ghigliotty testified that she prepared the foster care service plans for all three children and filed the three plans together with the clerk's office on June 22, 2006. To file the documents, she prepared a DC-522 transmittal form, like the one in A.M.'s court file. After reviewing the documents in the file and hearing the testimony, the trial court denied the motion to strike.

At trial, CDSS presented evidence that the parents failed to take the required anger management class, failed to seek and follow through with the treatment recommended in the parental capacity evaluation report, and failed to attend individual and marital counseling.

Like his wife, father failed to seek or follow through with the recommended marital and individual counseling. Additionally, he never obtained an individual substance abuse evaluation. Independently, father chose to attend a substance abuse program at the Elim Home in the spring of 2006. Kathy Ghigliotty testified, however, that she "never received any reports from Elim or any professionals in substance abuse counseling indicating that [father] ha[d], in fact, completed a substance abuse treatment program." He completed the parenting course and paid child support.

At the conclusion of the proceedings on December 5, 2006, the trial court made several findings on the record and entered the following ruling: "So by clear and convincing evidence, for those reasons . . . I find that the parents have not within a reasonable period of time remedied the conditions that brought the children into foster care despite reasonable and appropriate efforts of the [CDSS] and others to try to help them." On December 19, 2006, the trial court entered a written order terminating the parents' parental rights. This appeal ensued.

## II. ANALYSIS

We recognize the well-settled principle that "[w]hen addressing matters concerning a child . . . the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. On review "a trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990) (citing Brown v. Brown, 218 Va. 196, 200, 237 S.E.2d 89, 92 (1977)). "In matters of a

child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Id. at 328, 387 S.E.2d at 795.

Furthermore, "[w]here, as here, the trial court heard the evidence *ore tenus*, its finding [of credibility, fact and weight] is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986).

### A. Timely Filing of the Foster Care Plans

The parents assert that CDSS failed to timely file the foster care plans as required by Code § 16.1-283(A). As a basis for their assertion, they rely upon the absence of date stamps on the original foster care plans in the custody of the clerk's office. Because none of the plans contains a date stamp confirming that the plans were filed prior to the filing of the petitions to terminate the parental rights, they argue CDSS has failed to meet its burden of complying with Code § 16.1-283(A). We disagree.

Code § 16.1-283(A) provides in pertinent part:

> No petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child.

In Rader v. Montgomery Co. Dep't of Soc. Servs., 5 Va. App. 523, 365 S.E.2d 234 (1988), we specifically addressed the requirement of following the statutory procedures set forth in Code § 16.1-283. We explained "[t]hese procedures must be strictly followed before the courts are permitted to sever the natural and legal bond between parent and child." Id. at 526, 365 S.E.2d at 235. Because

> termination of parental rights is a grave, drastic, and irreversible action, we have held that it is implicit in the statutory scheme . . . that the natural parent, at subsequent hearings concerning that child, is entitled to prior and specific notice of the disposition sought by the agency in whose custody a child has been placed.

Strong v. Hampton Dep't of Soc. Servs., 45 Va. App. 317, 320-21, 610 S.E.2d 873, 875 (2005) (citations and internal quotation marks omitted). Given that parental rights are at risk in these proceedings, "due process requires the trial courts to comply strictly with the statutory scheme for disposition of child custody cases." Id. at 321, 610 S.E.2d at 875.

The clerk of a district court is exclusively vested with the responsibility of "keeping the records and accounts of [that] court." Code § 16.1-69.40. Moreover, the clerk of a district court and the deputy clerks who work for that clerk are the sole custodians of the records of that court. See Williams v. Commonwealth, 35 Va. App. 545, 557, 546 S.E.2d 735, 741 (2001). Rule 1:4(h) provides: "The clerk shall note and attest the filing date on every pleading." Longstanding precedent has held that "[o]rdinarily, the date of filing noted by the clerk on papers filed in his office is conclusive." Leigh v. Commonwealth, 192 Va. 583, 585, 66 S.E.2d 586, 587 (1951).

Our Supreme Court has held, however, that an "error made by a ministerial officer of the court" should not prevent a litigant from proceeding with his claim if he has otherwise complied with the applicable rules of court. Id. at 586-87, 66 S.E.2d at 588-89 (permitting the use of affidavits to refute the clerk's filing date on a notice of appeal because the clerk was "uncertain just when the notice of appeal was filed"). Here, the trial court heard testimony from Janet Brown, Clerk of the J&DR, who verified that transmittal forms for two of the foster care plans were date stamped June 22, 2006. As Clerk, Ms. Brown provided an explanation for the absence of a date stamp on the actual foster care plans when she testified that, "Generally, it's the top, the transmittal [form] [that] is stamped, not the actual plan."

The court files for A.M. and S.M. contained foster care transmittal sheets bearing date stamps of June 22, 2006. The foster care transmittal sheet, Form DC-552, is the form approved by the Committee on District Courts "to be used as the cover sheet for all foster care plans sent

to court"; therefore, it constitutes part of the pleadings. Thus, appellants' argument concerning the inadequacy of the date stamp on the cover sheet is without merit. Id. at 585, 66 S.E.2d at 588.

While the transmittal form for R.M. was not included in the court file, Kathy Ghigliotty testified that she filed foster care plans and transmittal forms pertaining to the three children at the same time with the J&DR clerk's office on June 22, 2006. After hearing the two witnesses testify, the trial court concluded: "I find from the evidence that the . . . foster care plans were filed June 22[], 2006, which was obviously before the termination petition was filed." Because "the trial court heard the evidence *ore tenus*, its finding [of credibility, fact and weight] is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin, 3 Va. App. at 20, 348 S.E.2d at 16.

Upon review of the record before us, we cannot say that the trial court's finding regarding the filing date was plainly wrong. Further, we conclude there is sufficient evidence from which the trial court could conclude that the foster care plans were timely filed and that it had jurisdiction over the petitions for termination of parental rights.

B. *Sufficiency of the Evidence:*
*Termination of Parental Rights under Code § 16.1-283(C)(2)*

The parents argue that CDSS failed to meet its burden of proof under Code § 16.1-283, by clear and convincing evidence. Essentially they assert a three-fold argument that 1) they have remedied "substantially the conditions which led to or required continuation of the [children's] foster care placement"; 2) after March 2006, CDSS failed to provide "reasonable and appropriate . . . social, medical, mental health or other rehabilitative" services; and 3) they had "good cause" to extend the twelve-month time period until the trial *de novo*, which began in September 2006. Upon review of the record, we disagree.

- 9 -

Under Code § 16.1-283(C)(2), the residual parental rights of a parent of a child placed in foster care may be terminated only if the court finds by clear and convincing evidence that 1) termination is in the best interests of the child; 2) the parent, without good cause, has been unwilling or unable within a reasonable period not exceeding twelve months to substantially remedy the conditions that led to or required the continuation of the child's foster care placement; and 3) the parent failed to remedy the conditions leading to foster care notwithstanding the reasonable and appropriate efforts of rehabilitative agencies.

1. Actions Taken to Remedy Conditions Leading to Foster Care Placement

The trial court found the parents failed to comply with the foster care service plans by refusing to take an anger management class and by not following through with referrals to determine whether additional services were necessary to support the family. Although mother began individual therapy in late July 2006, she abruptly stopped in October 2006. Moreover, she provided no explanation for failing to take the anger management class.

As for father, he explained that he did not enroll in an anger management class because "[he] doesn't get angry anymore." He further explained that he did not follow through with marital or individual counseling because the individual "never called [him] back to confirm that meeting . . ." and he never went for the substance abuse evaluation because "they [CDSS] never set it up."

The parents contend that the principal conditions that led to the removal of their children were the father's alcohol abuse and the lack of suitable housing.[5] Furthermore, they assert that

---

[5] When the children were removed in June 2005, the family was living at the Super 8 Motel in Culpeper. The family had previously lived in a shelter and at the Sleepy Hollow Motel. After the children were removed, the parents lived at the Sleepy Hollow Motel until father entered the Elim Home. The trial court made the following ruling at the conclusion of the hearing: "They did not have appropriate housing until August of '06, which was after the hearing in the J&DR Court. Hearings in the J&DR Court and the decisions there seem to prompt some attention by these folks. So in August, they got appropriate housing."

his voluntary admission and completion of the two-month residential program for alcohol abuse at Elim Home, and his subsequent months of total sobriety, demonstrate that the alcohol abuse issue has been remedied.

In the case before us, the parents have focused their attention on the progress they have made while failing to acknowledge crucial parts of the foster care plans that they admittedly refused to follow. Given the seriousness of the abuse and neglect that resulted in the initial foster care placement, the evidence clearly supported the trial court's determination that the parents had not substantially remedied the conditions that resulted in that placement.

### 2. Reasonable and Appropriate Services

The parents further assert that CDSS failed to provide "reasonable and appropriate . . . social, medical, mental health or other rehabilitative" service and that they had "good cause" to extend the twelve-month time period. Here, the evidence showed just the opposite. CDSS provided the parents with a variety of referrals to determine the specific needs of the family. Further, CDSS offered to assist the family in obtaining funds to cover the expenses associated in obtaining the necessary services; however, the parents chose not to avail themselves of these resources. The record reflects that despite efforts by CDSS to encourage the parents to engage in counseling, the parents were unwilling to engage in counseling services.

Lastly, after the goal of "return home" was disapproved on February 9, 2006, CDSS owed no duty to provide additional services. Akers v. Fauquier Co. Dep't of Soc. Servs., 44 Va. App. 247, 604 S.E.2d 737 (2004).

### 3. Extension of Twelve-Month Period under Code § 16.1-283(C)(2)

Absent "good cause," parents who receive appropriate and reasonable services of rehabilitative agencies must substantially remedy the conditions that led to the foster care placement of their children in a "reasonable period *not to exceed twelve months from the date the*

*child was placed in foster care.*"  Code § 16.1-283(C)(2) (emphasis added).  Code

§ 16.1-283(C)(2) further provides, in pertinent part, that

> Proof that the parent or parents, without good cause, have failed or
> been unable to make substantial progress towards elimination of
> the conditions which led to or required continuation of the child's
> foster care placement in accordance with their obligations under
> and within the time limits or goals set forth in a foster care plan
> filed with the court . . . shall constitute prima facie evidence of this
> condition.

The parents contend there was "good cause" to extend the twelve-month period to

provide an additional opportunity for compliance under Code § 16.1-283(C)(2).  They reason

that once the foster care plan goal was changed to adoption in March 2006, CDSS no longer

provided meaningful assistance and they were forced to "show they could be suitable parents" on

their own.  The parents, however, have misconstrued the "good cause" provision of the statute.

It refers to a justification for the parents' inability to eliminate the causes of foster care

placement; it does not serve to extend the period of time within which that must be

accomplished.  Therefore, under the statute, a parent's efforts to resolve the conditions pertinent

to the termination proceedings are constrained by time.  See Lecky v. Reed, 20 Va. App. 306,

312, 456 S.E.2d 538, 540 (1995).

The parents have made progress since the children were removed from their care.

However, this case turns on the weight the trial court afforded their progress in the termination

proceedings in light of the best interests of the children.  We have addressed similar issues

before, and held that a court may consider post-petition efforts made by a parent to remedy

conditions in determining whether termination of parental rights is in the best interests of a child.

Roanoke City Dept. of Soc. Servs. v. Heide, 35 Va. App. 328, 337-38, 544 S.E.2d 890, 894-95

(2001).  In considering the parent's efforts, we concluded that

> The trial court may discount the parent's current "progress" if the
> best interests of the child would be served by termination.

- 12 -

> However, . . . the trial court may determine that a parent's delayed,
> but nonetheless substantial, progress may overcome the time delay.
> We will not deprive the trial court of the opportunity to weigh the
> rights of the parents and the best interests of the child.

Id. at 337, 544 S.E.2d at 894.

In a subsequent opinion, we explained that "Heide clearly opines that a parent, despite a goal of adoption, may on his or her own initiative, seek help and remedy the conditions that brought the child into foster care." Akers, 44 Va. App. at 259, 604 S.E.2d at 742. However, "there is a finite time frame for both subsections (C)(1) and (C)(2)." Id. at 260, 604 S.E.2d at 743. This time frame is governed by statute. See Code § 16.1-283(C)(2).

We are also mindful that when considering terminating parental rights, the "child's best interest is the *paramount* concern." Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 827, 433 S.E.2d 500, 503 (1993) (emphasis added). When deciding what is in a child's best interest, the trial court considers many factors, including:

> the age and physical and mental condition of the . . . children, the
> age and physical and mental condition of the parents; the
> relationship existing between each parent and each child; the needs
> of the . . . children; the role which each parent has played, and will
> play in the future, in the upbringing and care of the . . . children,
> and such other [necessary] factors . . . .

Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 579-80, 625 S.E.2d 670, 673-74 (2006). The best interests of the child are to be determined at the time of the termination hearing. Akers, 44 Va. App. at 259, 604 S.E.2d at 742.

The trial court permitted the parents to introduce evidence of their ongoing and continued progress in attempting to correct the conditions that led to the foster care placement, but based upon the record, we conclude that reasonable and appropriate services were provided, and the trial court did not err in failing to further extend the twelve-month period for the parents to comply with Code § 16.1-283(C)(2).

## C. Failure to Pursue Termination Proceedings

The parents argue that their parental rights have been prejudiced by the failure of CDSS to pursue the termination petitions in a timely and proper manner. They assert that CDSS delayed the termination proceedings, leading to a "drift," and that during the twelve-month period, CDSS missed certain deadlines.

As principal authority for this argument, they rely upon the following language explaining the purpose of the time limit set forth in Code § 16.1-283(C)(2):

> The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement. This provision protects the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship without interminable delay. The legislation established a reasonably presumptive time frame of twelve months for parents to receive rehabilitative services to enable them to correct the conditions that led to foster care placement.

L.G. v. Amherst Co. Dep't of Soc. Servs., 41 Va. App. 51, 56-57, 581 S.E.2d 886, 889 (2003) (internal citation and quotation marks omitted).

CDSS and the guardian *ad litem* suggest, and we agree, that read in the proper context, as set forth in the quote *supra*, the word "drift" primarily pertains to protecting the interests and well-being of the children. Moreover, the parents cite no specific prejudice or harm that they have suffered due to the delay. Further, the delays in this case were not solely attributable to CDSS. In April 2006, father requested a continuance and additional time to seek alcohol treatment. Thereafter, at trial, the trial court permitted the parents to introduce evidence of their ongoing and continued progress. See Heide, 35 Va. App. at 337, 544 S.E.2d at 894. Based upon this record, we conclude the trial court did not err in ruling that CDSS timely pursued termination petitions.

- 14 -

### III. Conclusion

For the foregoing reasons, we affirm the decision of the trial court terminating the parents' parental rights.

Affirmed.