# Richmond

## Douglas Callahan v. Commonwealth of Virginia.

March 12, 1951.

Record No. 3778.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*J. Segar Gravatt* and *W. E. Neblett,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *H. T. Williams, Jr., Special Assistant,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Douglas Callahan, having been indicted for the murder of David Emmett Jones, was tried by a jury, convicted of voluntary manslaughter, and his punishment fixed at five years in the penitentiary. We granted a writ of error to review the judgment entered upon that verdict.

The main assignment of error is that the evidence is insufficient to support the verdict. The record shows that on Saturday, December 3, 1949, between the hours of 9:30 and 10 o'clock p. m., Douglas Callahan, the accused, and his 27-year-old son, "Tessie," stopped at a restaurant, beer and wine dispensary in the town of Victoria, patronized by the members of the colored

race, and referred to in the testimony as "Tidewater Gardens" or "Sebron Allen's place." Among other patrons there assembled were David Emmett Jones, James Crowder, his brother-in-law, and George Crowder.

The Callahans remained inside the cafe for only a short while and returned to their automobile which was parked across the road, some thirty-seven feet from the porch in front of the entrance to the building. Upon reaching the car Tessie Callahan decided to return to the cafe to purchase some cigarettes and in the meantime the elder Callahan remained near the automobile.

Although there had been no previous disorder or disagreement, according to Tessie Callahan, when he reached the front door his entrance was barred by James Crowder and an argument between the two ensued and lasted some several minutes. Tessie Callahan testified that Crowder drew a knife on him and threatened to cut him. The elder Callahan said that from his position in the road he saw the knife in Crowder's hand.

On the other hand, while Crowder admits that an argument took place between him and Tessie Callahan at the entrance, he (Crowder) denied that he drew a knife on Tessie or made any threats against him.

All of the witnesses agree that this quarrel commenced while Jones was inside the cafe. According to the Commonwealth's witnesses, Jones came out of the cafe while the two men were quarreling at the entrance, and started down the walk toward the road where the Callahan car was parked. When Jones had taken about three steps from the porch Callahan, who was standing in the road near his car, fired a pistol in Jones' direction, the bullet striking the ground in front of him. As Jones continued along the walk and when he was about twenty feet from the elder Callahan, the latter fired two shots in rapid succession, both striking Jones.

The Commonwealth's witnesses gave no reason for Jones' approach toward Callahan. They say that prior to the shooting no words had been exchanged between them, and that Jones made no threats against Callahan and was unarmed.

Tessie Callahan and the accused tell quite a different story with reference to Jones' part in the affray. They say that while the argument was going on between Tessie Callahan and James Crowder, Jones and George Crowder came out of the cafe and

joined the two men on the porch. Thereupon Douglas Callahan, the accused, who was standing by his car in the road, called to the group on the porch and said, "All you boys not going to jump on that one boy." With that Jones threw his hat down and said to the elder Callahan, "You gray-headed son of a bitch," "I am going to kill you." Jones then started down the walk toward the elder Callahan. Callahan said to Jones, "Don't come to me," "I can't see what's in your hand." With that warning, the elder Callahan said, he fired a shot into the ground in front of Jones. When Jones continued to advance Callahan fired in rapid succession two shots which struck Jones.

The first shot and the one which caused his death, struck Jones in front of the right shoulder and ranged downward into the lung. The other shot struck the deceased "in the back of the shoulder" and likewise ranged downward. According to the medical testimony, Jones was probably in a crouching position when hit. The attending physician at first expressed the view that Jones was shot "at close range," but "how close" he would not say. On cross-examination he said that the black mark or smudge on Jones' shirt, which he thought was a powder burn, and which he thought indicated that the shot had been fired at close range, may have been made by the bullet in passing through the cloth.

It is significant that Callahan did not say how close Jones was to him when the two fatal shots were fired. According to Tessie Callahan, the first shot was fired before Jones left the porch, and the other two when Jones had taken "about three steps" from the porch. Since the elder Callahan was in the road near his car, which was parked some thirty-seven feet from the porch, this indicates that the two men were at least twenty-five feet apart when the fatal shot was fired. The Commonwealth's witnesses, as we have said, estimate the intervening distance at twenty feet.

No knife or other weapon was found upon Jones after the shooting, although the elder Callahan stated that he saw George Crowder, who came to Jones' assistance after the shooting, take "something out of his hand." All of the witnesses for the Commonwealth, including George Crowder, testified that Jones had no knife in his hand either prior to or immediately after the shooting.

After he had been taken to the hospital and shortly before

he died, Jones was asked, "Why did he shoot you?" and his reply was, "For nothing."

Callahan left the scene immediately after the shooting and efforts to apprehend him that night and the next day were unsuccessful. It developed that he had gone to New Jersey, whence he was extradited and returned to this State for trial.

The argument that the verdict is unsupported by the evidence runs thus: The testimony of the Commonwealth's witnesses that prior to the shooting there had been no quarrel or difficulty between Callahan, the accused, and Jones, the deceased, and that no words or threats had been exchanged between them, is "incredible and contrary to human experience" and should have been discarded by the jury as untrue. Therefore, it is said, the account given by the accused and his son of the incident is the only one worthy of belief, and that this makes out a case of excusable homicide in self-defense.

But the jury, of course, was not bound to have accepted *in toto* either account. It may have accepted as true some of the testimony of the witnesses on both sides and discarded some. It may have decided that the shooting was preceded by the incidents as related by the two Callahans, and yet have concluded, as the Commonwealth's witnesses say, that Jones made no threats against the elder Callahan, was unarmed, and gave no indication of inflicting any great bodily harm upon him.

The killing was with a deadly weapon, in the previous possession of the slayer, and, according to the evidence of the Commonwealth, without any or upon very slight provocation. We have repeatedly said that under such circumstances the homicide is *"prima facie* wilful, deliberate, and premeditated," and "throws upon the accused the necessity of proving extenuating circumstances." *Perkins* v. *Commonwealth,* 186 Va. 867, 874, 44 S. E. (2d) 426, 429.

Excusable homicide in self-defense is an affirmative defense, and, if established by the evidence, entitles the accused to an acquittal. Such a case is made out where the accused, although in some fault in the first instance, has abandoned the conflict in good faith and "retreated to the wall," and has killed his adversary from a reasonably apparent necessity to preserve his own life or to save himself from great bodily harm. *Dodson* v. *Commonwealth,* 159 Va. 976, 983, 167 S. E. 260.

In the case before us, whether the deceased had

threatened the accused with death or serious bodily harm, and whether the accused had reasonable grounds to believe such threats would be carried into execution, were questions to be determined by the jury. *Bevley* v. *Commonwealth,* 185 Va. 210, 215, 38 S. E. (2d) 331, 333.

Indeed, the jury may well have concluded that even under the version of the accused the homicide was not excusable. It may have decided that the accused, not knowing whether or not Jones had a knife in his hand as he approached, did not have reasonable grounds to take his life.

We are of opinion that the jury was amply warranted under the evidence in finding the accused guilty of voluntary manslaughter.

Error is assigned to the action of the trial court in giving the usual instructions defining murder in the first degree and murder in the second degree. The argument is that there was no evidence on which a verdict of murder in either degree could have been based, and hence the instructions on the subject "were calculated to impress the jury with the gravity of the offense out of proportion to the crime established by the testimony."

There is no merit in this contention. It is elementary law in this jurisdiction that every homicide is presumed to be murder in the second degree, and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth. On the other hand, in order to reduce the offense from murder in the second degree to manslaughter or excusable homicide, the burden is upon the accused. *Lloyd* v. *Commonwealth,* 185 Va. 674, 677, 40 S. E. (2d) 258, 259.

Except in cases where the evidence establishes beyond question that the killing was unpremeditated and without malice, the jury should be instructed as to the degrees of homicide and as to the punishment therefor provided by statute. *Bradshaw* v. *Commonwealth,* 174 Va. 391, 401, 4 S. E. (2d) 752, 756.

On the whole we find no error in the record and the judgment complained of is

*Affirmed.*