# Richmond

WADDELL SMITH v. COMMONWEALTH OF VIRGINIA.

May 7, 1951.

Record No. 3828.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan and Smith, JJ.

The opinion states the case.

*Philip Lee Lotz,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Thomas M. Miller, Assistant Attorney General,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Waddell Smith, sometimes referred to herein as the defendant, was convicted by a jury of second-degree murder and sentenced to serve twenty years in the penitentiary for the killing of John Bondes. On this writ of error the defendant's main contention is that the verdict is not warranted by the evidence.

At the time of the homicide the defendant was thirty years of age, a foreman of a group of orchard workers, and lived with his wife and their foster child in the community known as Christians, in Augusta county. The deceased, John Bondes, was thirty-seven years of age, a native of Georgia, and an itinerant laborer who came to Augusta county in October, 1949. He had a room at the home of Elizabeth Wright, the mother-in-law of the defendant, who likewise lived at Christians.

On the afternoon of November 8, 1949, both men went to Staunton, a distance of about ten miles from Christians. They did not make the trip together, but met at a restaurant where

they were joined by Smith's wife, mother-in-law, and child. Smith engaged a taxicab to take his family home and Bondes sought and obtained permission to accompany them. The two men sat on the front seat with the driver, while the two women and the child occupied the rear seat.

Bondes had been drinking and was in an ugly mood. On the trip home he made a reference to Smith's wife which Smith resented. An argument ensued, Bondes threatened Smith repeatedly, and invited him to get out of the cab and fight. Smith declined the invitation.

Smith testified that Bondes accompanied these threats with the display of a knife, but neither the cab driver nor any of the other occupants of the cab saw this. At the insistence of the cab driver Bondes quieted down and the trip to Christians was completed without serious trouble.

Upon their arrival at their destination the entire party entered the Smith home. The two men sat on the sofa in the living room for a short while and then went to the kitchen, in the rear of the building, and had a drink of wine. The women remained in the living room and bedroom at the front of the house.

Shortly after the men had gone into the kitchen Bondes resumed his argumentative and threatening attitude toward Smith. According to a witness for the Commonwealth, Bondes said, "I will cut a man's head off in a minute and think nothing about it." Mrs. Wright, Smith's mother-in-law, undertook to quiet Bondes and suggested that he and she leave and go to her home, but Bondes declined to do so.

Smith then left the kitchen and went to the bedroom where he took down a shotgun which hung over the door. He procured a cartridge from a bureau drawer in the bedroom, loaded the gun, and walked to the doorway which led from the living room into the adjoining dining room. Bondes, who had remained in the kitchen, was visible to Smith through the doorways leading from the living room into the dining room, and from this latter room into the kitchen.

According to the Commonwealth's witnesses Smith called twice to Bondes who turned toward him, and as he did so Smith fired the gun from his hip, inflicting a wound from which Bondes died shortly.

Smith testified that after he had loaded the gun and was

standing at the door leading from the living room into the dining room, he called to Bondes in the kitchen and said to him, "Get out of here;" that Bondes then "reached his hands in his pocket and started toward me;" and that he (Smith) then fired the fatal shot.

All the witnesses, including the defendant, agree that the fatal shot was fired from the living room, through the door lead-ing into the dining room, across the dining room and through the door leading into the kitchen, where the deceased was standing, some twelve to fourteen feet away. The deceased was unarmed at the time of the shooting.

We are of opinion that the evidence which we have related amply supports a finding of second-degree murder. It is elementary law in this jurisdiction that every homicide is presumed to be murder in the second degree, and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth, and the burden is on the accused to reduce the offense from murder in the second degree to manslaughter or excusable or justifiable homicide. *Lloyd* v. *Commonwealth,* 185 Va. 674, 677, 40 S. E. (2d) 258, 259; *Callahan* v. *Commonwealth, ante,* p. 26, 63 S. E. (2d) 617, 620.

It is also an established principle of our criminal law that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon very slight provocation, is *prima facie* willful, deliberate and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances. *Bailey* v. *Commonwealth,* 191 Va. 510, 517, 62 S. E. (2d) 28, 31; *Callahan* v. *Commonwealth, supra.*

Whether the accused has borne the burden imposed on him under these principles is usually for the jury to decide.

Admittedly, there was no fight or physical combat between the men immediately preceding the shooting. No doubt the defendant was incensed by the boastful threats of the deceased, but "It has long been the settled rule in Virginia that words alone, however grievous or insulting, cannot justify taking human life with a deadly weapon, nor reduce the grade of such a homicide below murder, or excuse the same." *Martin* v. *Commonwealth,* 184 Va. 1009, 1016, 1017, 37 S. E. (2d) 43, 46, and cases there cited.

According to the Commonwealth's evidence the defendant, upon the very slight provocation of these threats, quit the pres-

ence of the deceased, procured the shotgun, loaded it, and deliberately shot the deceased when the latter turned in response to the defendant's call. Clearly, under such evidence, the jury had the right to say that the killing was without excuse or justification. Indeed, such evidence was sufficient to sustain a verdict of murder in the first degree. Code 1950, § 18-30.

Moreover, the jury may well have concluded that under the defendant's version the homicide was not excusable or justifiable. They may have decided that the defendant, not knowing whether Bondes had a knife or other weapon in his pocket, as he stood more than twelve feet away, did not have reasonable grounds to take his life. *Callahan* v. *Commonwealth, supra.*

It follows from what has been said that the lower court was right in granting the usual instructions defining murder in the first degree and murder in the second degree.

Complaint is made of the action of the trial court in refusing to grant Instruction A, offered by the defendant, which read thus:

"The court instructs the jury that the law presumes that the defendant, Waddell Smith, is innocent of the charge against him, and this presumption of innocence continues with him throughout the entire case, and that *the presumption of innocence is so strong* that if the case be a doubtful one the presumption is always sufficient to turn the scales in favor of the accused." (Italics supplied.)

The record shows that the lower court was of opinion that the first portion of the instruction was proper, but that the italicized words were objectionable. In our opinion this ruling was correct. While the defendant was entitled to an instruction embodying the principle that the presumption of innocence continues with him throughout the entire case (*Grosso* v. *Commonwealth,* 177 Va. 830, 844, 13 S. E. (2d) 285, 290), he offered no such instruction without the objectionable language.

It is true that we have characterized the strength and effect of the presumption of innocence substantially in the language incorporated in the latter portion of the instruction,[1] but as we have frequently said, language appropriate in an opinion is not always appropriate in an instruction.

[1] See *Widgeon* v. *Commonwealth,* 142 Va. 658, 666, 128 S. E. 459, 461; *Sutherland* v. *Commonwealth,* 171 Va. 485, 494, 198 S. E. 452, 456; *Smith v. Commonwealth,* 185 Va. 800, 820, 40 S. E. (2d) 273, 282; *Thomas* v. *Commonwealth,* 187 Va. 265, 272, 46 S. E. (2d) 388, 391.

The italicized language, as used in the instruction, unduly emphasized the weight to be attached by the jury to the presumption of innocence. In arriving at their verdict, the presumption of innocence must be weighed by the jury along with all of the evidence in the case. In this respect the rights of the defendant were fully protcted by Instruction A-1, which told the jury that "the party accused is entitled to the benefit of the legal presumption in favor of innocence, which in doubtful cases is always sufficient to turn the scale in his favor."

We find no error in the record and the judgment complained of is

*Affirmed.*