# Richmond

ROBERT A. PLYMALE v. COMMONWEALTH OF VIRGINIA.

January 25, 1954.

Record No. 4155.

Present, All the Justices.

The opinion states the case.

*Hale Collins* and *T. W. Messick*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Francis C. Lee, Assistant Attorney General*, for the Commonwealth.

MILLER, J., delivered the opinion of the court.

Robert A. Plymale was indicted for the murder of W. D. Deal. After a trial that lasted three days he was convicted by a jury on September 27, 1952, and his punishment fixed at forty years' confinement in the penitentiary. From the judgment entered on October 30, 1952, confirming that verdict, writ of error was granted.

Numerous assignments of error are made, but some need not be considered, and those material to this decision may be stated as follows:

Accused contends that:

(1) The *corpus delicti* was not proved.

(2) The court should have sustained his motion to strike the Commonwealth's evidence made at the conclusion of all the evidence or sustained the motion to set aside the verdict as contrary to the law and the evidence.

(3) Improper and damaging evidence was admitted.

(4) The court erroneously refused to exclude E. A. Thompson, sheriff of Alleghany county, from the court room and allowed him to attend the court and have charge of the jury though he was a material witness for the Commonwealth.

(5) Instructions tendered by accused were improperly refused.

Plymale was arrested on June 19, 1952, about one p. m. upon a warrant sworn out by Sheriff Thompson, and it was upon the latter's testimony and that of Lewis Goode, deputy fire marshal, that the indictment was returned.

It was established by the Commonwealth that deceased owned a two-story apartment house, known as the Deal building, in Covington, Virginia. He occupied two rooms on the first floor and rented an apartment on that floor to accused, which was occupied by him, his wife, and three children. Two apartments on the second floor were occupied by other families.

On Friday, June 13, 1952, about 3:30 a. m. a woman occupant of the upper floor discovered that a fire was burning in Deal's apartment below her. She aroused the tenants of the second floor, and then the Plymale family was notified of the danger by calls and knocking on their window, but the fire had gained such headway in Deal's apartment that it could not be entered nor could Deal be aroused.

When the city fire department arrived, the ceiling of Deal's bedroom had not collapsed, but before the fire was brought under control, some heavy timbers fell into the room. About six a. m. entry was made into Deal's apartment which was more severely burned than other parts of the building, and his charred body was found upon his bed under a considerable amount of rubbish, timbers and debris. In preparing the body for burial, the funeral director discovered that deceased's skull was fractured near the eyebrow. He notified Dr. Hanna, medical examiner for Alleghany county, who examined the body. In making this examination, he removed the upper half of Deal's skull and the brain. Yet it does not appear that he attached significance to the skull fracture, for

upon completion of his task, a permit was issued for interment. Because of the burned condition of the body, it was impractical to inject embalming fluid into the arteries. To preserve it the intestines were removed and formaldehyde put into the abdominal cavity and applied externally to the remains. The body, enclosed in a rubber sack and the intestines, brain and skull, treated with formaldehyde and wrapped in a separate package, were all encased in a casket and transported to West Virginia on June 15, 1952, and buried on that day.

Upon discovery of Deal's burned body, no one seems to have suspected that he had been murdered. However, a day or two after his death examination of his bed disclosed that the partially burned mattress, pillow and pillow case appeared to be stained with blood. Upon further investigation by Sheriff Thompson and Lewis Goode, a warrant was sworn out on June 19, 1952, against Plymale for murder and he was taken into custody about one p. m. on that day.

On June 26, 1952, Deal's body was exhumed in West Virginia. The next day it was taken to Richmond, Virginia, where an exhaustive *post mortem* examination was performed by Dr. G. T. Mann, state medical examiner.

This examination revealed that Deal's skull and face had been fractured in several places and the brain severely injured. By examination of the trachea, bronchi, and lungs, and through analysis of red blood cells found "in the cranial cavity" and in "the left pleural cavity," it was determined that Deal had ceased to breathe before he was burned. In short, he was dead before he was burned, and Dr. Mann attributed his death to the multiple fractures of his skull and face, which, in his opinion, had been inflicted with some blunt instrument. In summing up his findings and stating his conclusions, he said:

"A. In my opinion, this decedent came to his death from hemorrhage and shock following multiple fractures of the skull and face."

Kenneth Rogers, a brother of Plymale's wife, who at the time of the trial was under arrest, bailed and awaiting preliminary hearing upon a warrant for forgery, was offered as a witness by the Commonwealth. He testified in part as follows: He said that he was fond of accused, and on Friday, June 13 (the day of the fire) the Plymale family came to the home of his father at nearby Sunnymede and stayed there until they could locate other quarters. Rogers talked to accused that morning and was with him at various times during each of the several days following the fire. On Monday, June 16, 1952, accused, who had been out of employment for some weeks, obtained work in Covington at Lugar's taxi service. The witness then went on to recount that he met Plymale at Lugar's taxi service on Tuesday night, June 17, about twelve o'clock when he got off from work, and at the instance of accused, drove him to an alley that extends behind the Deal building. There Plymale alighted from the car, directed Rogers to drive around the block, and accused went into the alley on foot and in a few minutes met Rogers at the appointed place and re-entered the car. They then rode on some distance further until accused told him to stop. He said that Plymale then took a large sum of money out of his pocket and exhibited it, and the witness gave this account of what accused said:

"A. He said you know now what I have done for this and you tell on me and I will do the same for you; he said he killed for this once and I will do it again and he made me promise I would not tell, and he counted out about ten ten dollar bills and put it in one pocket and put the other in the other and he got out of the car and told me to cut out the lights and went up in the woods and was gone about fifteen minutes and he came back and we drove to Sunnymede."

Rogers further testified that he took accused to work on Wednesday, June 18. On that occasion Plymale told him that there was an iron bar hidden in a chimney in the Deal building and said "for God's sake get it that is the only thing that will incriminate me in the killing of old man Deal."

\* \* \* "He told me to take it and throw it into the river."
Witness then related that he got the bar, but instead of
throwing it in the river, he "took it up to Fudge's hollow and
threw it down" beside the road.  Later in the day he in-
formed Plymale what he had done, and accused exclaimed,
"for God's sake go up there and get it somebody might have
seen you take it up there and get it and throw it in the
river."  Rogers said he went back, got the bar, took it down
to Sunnymede and put it under an old ice box that "belongs
to my Dad," which was sitting beside a building.  He took
accused to work again on Thursday morning, and on that
occasion Plymale told him that after killing Deal he "poured
some oil and stuff there and set fire to it."  On the afternoon
of this conversation, *i.e.*, Thursday, June 19, 1952, witness
said that he imparted all of this information to the sheriff and
went with Thompson and showed him the iron bar.

Throughout the trial accused advanced the theory
that the fractures in Deal's skull were inflicted by the timbers
that fell into the bedroom.  He also insisted that Rogers was
unworthy of belief, and it was proved that he had been con-
victed of a felony.  The testimony of several reputable wit-
nesses was also offered, which was that Rogers' reputation
for truth and veracity was bad.

On February 3, 1953, some three months after entry of
final judgment, accused also tendered an affidavit made by
Kenneth Rogers under date of November 29, 1952, in which
affiant repudiated his damaging testimony given against ac-
cused at the trial; stated it was false and asserted that it had
been given at the instance of Sheriff E. A. Thompson and be-
cause of a promise made to him by the sheriff that he, Rogers,
would not be punished on the charge pending against him
for forgery if he would give the false testimony.  On the
basis of recitals in this affidavit, accused made an additional
or supplemental motion to set aside the verdict, vacate the
judgment entered on October 30, 1952, and grant a new
trial.  But the court ruled that the judgment became final on
November 15, 1952, and thus "the Court is without jurisdic-

tion to entertain said motion * * * ." On February 5, 1953, this ruling of the court was sought to be made a supplemental assignment of error.

By its verdict the jury rejected Plymale's theory that the fractures in Deal's skull were inflicted by timbers that fell into the bedroom. The evidence of Dr. Mann and the extra-judicial admissions or confessions testified to by Rogers were more than ample to justify their conclusion that Deal's death was caused by criminal violence, and thus the *corpus delicti* was clearly proved. *Bowie* v. *Commonwealth*, 184 Va. 381, 35 S. E. (2d) 345; *Orange* v. *Commonwealth*, 191 Va. 423, 61 S. E. (2d) 267; *Campbell* v. *Commonwealth*, 194 Va. 825, 75 S. E. (2d) 468; 26 Am. Jur., Homicide, secs. 326, 383, pages 376, 425; 23 C. J. S., Criminal Law, sec. 916, pages 181, 182.

Though Rogers had been convicted of a felony, and there was much testimony that his reputation for truth was bad, yet those circumstances merely tended to impeach him. It was within the province of the jury to give such weight to his testimony as it deemed proper. His evidence, when considered along with the other facts and circumstances, was sufficient to prove that Plymale was the criminal agent, and thus there was no error in the court's refusal to strike the evidence or set aside the verdict on the original motion.

The merit and sufficiency of other assignments of error render it unnecessary that we pass upon the court's ruling and refusal to consider the affidavit made by Rogers on November 29, 1952, and tendered on February 3, 1953, and the alleged supplemental assignment of error. The same question is not likely to arise upon the next trial, and we express no opinion upon that phase of the proceeding.

Sheriff Thompson and Lewis Goode appeared as witnesses for the Commonwealth. They said that on the night of June 19, 1952, about 11:30 o'clock p. m., they talked to accused at the jail, and warned him of his constitutional rights and "told him he did not have to tell us anything or any other officer that might be used against him in court," and that "if

he did not want to say anything, it was perfectly all right with us, it did not make any difference."

When the sheriff was asked to state what was thereafter said in the presence of accused that night and what Plymale said to him, counsel for accused said, "We don't want the witness to state any hearsay evidence." The court, however, overruled the objection and said:

"If the statements were made in the presence of the defendant it is admissible or anything said by the defendant it is admissible."

When Lewis Goode undertook to testify as to what accusations were made against accused by the sheriff and what accused said, counsel also objected and said:

"Mr. Collins: We object to this, its hearsay all the way through."

The court overruled that objection, and both witnesses were allowed to testify in detail as to what accusations were made against accused and what he did and said. Their testimony was to the following effect:

The sheriff exhibited the iron bar to Plymale and accused him of murdering Deal, stealing his money and watch, and burning the building. In this accusation the sheriff went into details.

He charged Plymale with having told Rogers to get the iron bar out of the chimney, with having made false statements as to where he obtained sums of money that he was known to have expended after the fire and with other inculpatory facts and circumstances. While these accusations were being made, accused remained silent. But Thompson and Goode testified that when the interview was concluded Plymale "said he had no statement for us" and that "he could not tell us anything."

The next morning, June 20, Plymale was again confronted by the sheriff. The following questions propounded to the sheriff by counsel and his answers disclose what was then said to and by accused. On direct examination he testified as follows:

"Q. Will you state to the Court and Jury the appearance of things when you saw the defendant? His appearance and his demeanor and anything you said to him and he to you?

"A. When I walked into the cell the floor was literally covered with cigarette butts. I don't recall whether he was standing or sitting at the time. I sat down on the bench and he sat down by me and I said to him, you know everything I told you last night was so, and to this he said yes."

On cross-examination of the sheriff, he gave this account of what was said:

"Q. * * * What did you say to him the first thing you remember you said to him. * * * "

"A. I don't remember what I said first but during the time I said to him you know everything I told you last night was so.

\* \* \* \* \* \* \*

"Q. What else did you say to him?

"A. I said further to him that it was a serious crime he was charged with and an awful thing to kill old man Deal and set his house on fire.

"Q. Did he say anything during that time?

"A. Yes, sir.

"Q. What did he say when you first told him about him knowing it was true or words to that effect?

"A. He said, I know it.

"Q. Did he know what you were talking about?

"A. I assumed he did.

"Q. And you assumed that Robert knew what you meant when you told him in effect that what you accused him of the night before was true. You assumed he knew what you were talking about?

"A. Yes, sir."

When accused testified, he denied having robbed or murdered Deal or having burned the building. He also denied having told Rogers any of the incriminating facts testified to by him. With respect to the sheriff's and fire marshal's de-

tailed accusations that had been admitted in evidence, he said that he made no admission to those officers, and at the conclusion of the interviews, denied that he had committed any crime. In explanation of what he was charged with saying on the morning of June 20, Plymale gave this account of that brief conversation:

"Q. Did Mr. Thompson make a statement to you that this was a serious crime; of killing Mr. Deal was serious matter? Do you recall him making such a statement?

"A. Yes, sir, he did.

"Q. Do you know what you said in reply?

"A. When he said it was mighty serious I said yes I know it was serious."

In *Owens* v. *Commonwealth*, 186 Va. 689, 43 S. E. (2d) 895, Justice Eggleston collected and reviewed authorities bearing upon the admissibility of evidence of the general character of that given by the sheriff and fire marshal. He then quoted with approval from 20 Am. Jur., Evidence, sec. 570, pages 483, 484, as follows:

"As a general rule, when a statement tending to incriminate one accused of committing a crime is made in his presence and hearing and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny are admissible in a criminal prosecution against him, as evidence of his acquiescence in its truth. The basis of such rule is that the natural reaction of one accused of the commission of a crime or of implication therein is to deny the accusation if it is unjust or unfounded. The *hearsay character of the incriminating statement made to the accused would render it inadmissible,* except for the fact that the statement is not offered in evidence as proof of a fact asserted but as a predicate to the showing of the reaction of the accused thereto. *Caution must be exercised, however, in receiving evidence of a statement made to the accused and his failure to deny it.* In order that the silence of one accused of crime following a statement of a fact tending to incriminate him may have the effect of a tacit admission, he must have heard the statement

and have understood that he was being accused of complicity in a crime, the circumstances under which the statement was made must have been such as would afford him an opportunity to deny or object, *and the statement must have been such, and made under such circumstances as would naturally call for a reply. The test is whether men similarly situated would have felt themselves called upon to deny the statements affecting them in the event they did not intend to express acquiescence by their failure to do so.* * * * " (At page 698. Emphasis added.)

When the testimony of the sheriff and the fire warden as to their interviews with accused was admitted, counsel merely objected that the testimony was hearsay. The objection would have been better understood had counsel reminded the court that accused had been advised that he did not have to say anything, and if he did not it was perfectly all right. Had he done that and then contended that Plymale's silence while the accusations were being made, and what he ultimately said, could not be fairly construed as tacit admissions of guilt, and thus the testimony of both officers was actually hearsay, the court would have been better apprised of why he contended that the evidence was inadmissible. Yet a fair appraisal of the testimony of the two officers does not show that accused admitted guilt by silence or by what he said, but it rather appears that he denied the accusations. His own testimony and explanation confirm that conclusion, and thus the testimony was actually hearsay and inadmissible. That it was harmful is certain.

When accused was cross-examined by the Commonwealth's Attorney, he was reminded of the incriminating facts and circumstances that Sheriff Thompson, Rogers, Goode and other named witnesses had testified to. Then he was asked the following questions as to the testimony of all the witnesses for the Commonwealth, with specific reference to that of four named witnesses.

"Q. In other words, if I understand you correctly, every witness for the Commonwealth, nearly every witness for the

Commonwealth, who has taken this stand, and who has testified to anything that is against you, is guilty of perjury or is guilty of falsifying?

"A. I have not said that.

"Q. Sheriff Thompson has falsified?

"A. He has.

"Q. Kenneth Rogers?

"A. Absolutely.

"Q. Mr. Lewis Goode has falsified, hasn't he?

"A. Whether that was intentional—

"Q. He did not tell it as you know it. William Craft has falsified?

"A. Yes, sir, he has."

The Commonwealth Attorney persisted in this type of examination. After questioning accused about other matters, he again called upon Plymale to further characterize the testimony of the sheriff by asking the following questions:

"Q. When Mr. Thompson told you what had happened to Mr. Deal was a serious thing, you said I know it is. You knew that much didn't you?

"A. I sure did.

"Q. And you also told him, I have no sympathy for the old son-of-a-bitch?

"A. I did not.

"Q. And Mr. Thompson is lying then?

"A. He absolutely is.

"Q. You will put your word against his?

"A. Yes, sir, I will."

    \*      \*      \*      \*      \*      \*      \*

"Q. As a matter of fact, Mr. Plymale, did you ever make any denial of it before Mr. Thompson and Mr. Goode?

"A. I did.

"Q. Then on that point Mr. E. A. Thompson and Mr. Lewis Goode they are falsifying?

"A. They are.

"Q. So, again, I say that all of these witnesses who have

said anything that is against you have strained the truth and are trying to frame you in this matter?

"A. Not all the witnesses."

No objection was made to these questions by counsel for accused. Yet no witness, much less an accused, should be required so to characterize the testimony of another witness, especially that of an officer who is then serving the court and has the jury in charge. The examination not only had the effect of requiring accused to specifically charge many witnesses with perjury, but it pointedly emphasized and made more harmful the court's admission of the accusations of guilt made by the sheriff and the fire marshal to the accused on the occasions that they interviewed him at the jail. The persistent examination of accused with regard to whether or not he meant that the sheriff was lying required the jury to try their custodian, the sheriff, for perjury and the accused for murder at one and the same time. No one can be so oblivious to the realities of the occasion as to believe that an atmosphere most detrimental to the accused was not thus created.

On the first day of the trial, counsel for accused asked that all witnesses be excluded from the court room. The judge indicated that he would grant the motion except as to the sheriff. Counsel then moved as follows:

"Mr. Collins: We want him excluded and one of the deputies who is not a witness to take the Court."

The court refused to exclude the sheriff with the other witnesses or to designate a deputy to attend the court and jury, and counsel excepted.

In *Campbell* v. *Commonwealth, supra,* a motion to exclude the sheriff, who was a witness for the Commonwealth was denied. In deciding that the trial court's action was not an abuse of discretion under the circumstances of that case, Mr. Justice Whittle said:

"In this instance the Commonwealth's case was complete without the evidence of the sheriff. His evidence in no way differed from the evidence of his deputies and the State police,

all of whom were excluded from the court room. It is not seriously argued that the failure to exclude the sheriff or the court's remarks about his remaining in the court room in any way prejudiced the accused. The record nowhere discloses that the court's ruling was prejudicial. * * * " (At page 834.)

It should be observed that in the *Campbell* case the motion was merely to exclude the sheriff, but here it was two-fold—to sequester and place a deputy in charge of the jury.

If the other witnesses are sequestered, and it is known that the sheriff is to testify, the better practice is to exclude him from the court room and require a deputy to attend the court and jury. As the facts ultimately developed, the refusal to sequester the sheriff and leaving the jury in his charge accentuated and made more detrimental his testimony which we have held to be inadmissible and prejudicial. Thus we conclude that in this instance it was error to refuse the motion.

█ The indictment was in short form as allowed by section 19-140, Code of 1950. Yet a bill of particulars filed by the Commonwealth charged premeditated murder and murder accomplished in the commission of robbery.

Relying upon the bill of particulars, the Commonwealth asked for and obtained instructions 1 and 2, in which the court told the jury that the killing of a person (1) "in the attempt or commission of robbery," and (2) all wilful, deliberate and premeditated killing was murder in the first degree. Thereupon accused requested instruction H, which was refused:

"The court instructs the jury that every homicide in Virginia is presumed, in the absence of other evidence, to be murder of the second degree and in order to elevate the offense to murder in the first degree the burden is upon the Commonwealth."

That all unlawful homicide is presumed to be murder in the second degree and that the burden is upon the Commonwealth to prove beyond a reasonable doubt the elements necessary to elevate the crime to murder in the first degree before conviction for the greater crime can be had, and

upon the accused to reduce the offense below the grade of second degree murder, is a long established principle of our criminal law. *Dingus* v. *Commonwealth*, 153 Va. 846, 853, 149 S. E. 414; *Bradshaw* v. *Commonwealth*, 174 Va. 391, 398, 4 S. E. (2d) 752; *Pannill* v. *Commonwealth*, 185 Va. 244, 256, 38 S. E. (2d) 457; *Lloyd* v. *Commonwealth*, 185 Va. 674, 677, 40 S. E. (2d) 258; *Callahan* v. *Commonwealth*, 192 Va. 26, 31, 63 S. E. (2d) 617; *Smith* v. *Commonwealth*, 192 Va. 186, 189, 64 S. E. (2d) 761; *Leigh* v. *Commonwealth*, 192 Va. 583, 590, 66 S. E. (2d) 586; *Blankenship* v. *Commonwealth*, 193 Va. 587, 591, 70 S. E. (2d) 335; 9 M. J., Homicide, secs. 24, 25, and 57, pages 364, 396, and cases cited.

So settled and of such long standing is this principle that thirty odd years ago it was characterized as "hoary with age." *Sims* v. *Commonwealth*, 134 Va. 736, 752, 115 S. E. 382.

"The question of whether a particular homicide is murder in the first or second degree is one of fact for the jury." *Williamson* v. *Commonwealth*, 180 Va. 277, 281, 23 S. E. (2d) 240.

Thus whether or not, on the one hand, this killing was murder in the second degree as it is presumed to be, or whether or not, on the other hand, the elements necessary to elevate the killing to murder in the first degree had been proved beyond a reasonable doubt were, in the final weighing of the evidence, matters of fact to be determined by the jury.

The instruction should have been given. If the Commonwealth had asked that it be amended or supplemented by combining it with instructions 1 and 2 so as to make it plain that wilful, deliberate and premeditated killing or killing in the commission of or attempt to commit robbery was murder in the first degree, it would have been proper to do so. The jury could then have also been told that the burden was upon the Commonwealth to prove the elements required to elevate the crime to first degree

murder and upon accused to lower the grade below second degree murder. Yet accused was entitled to have the benefit of the presumption in his favor presented to the jury. This was not done by any instruction, and the refusal to accord him the benefit of that presumption was not warranted.

Though not well phrased, the effect of instruction I that was refused was to advise the jury that the *corpus delicti* could not be proved solely by extra-judicial confessions or admissions. There had to be some corroborating evidence before that essential element could be deemed to have been established. *Wheeler* v. *Commonwealth*, 192 Va. 665, 66 S. E. (2d) 605; *Cleek* v. *Commonwealth*, 165 Va. 697, 181 S. E. 359; *Campbell* v. *Commonwealth*, *supra*.

The instruction dealt with a vital phase of the case, and as tendered, or one of similar import, should have been given.

For the reasons stated the judgment is reversed and a new trial awarded.

*Reversed and remanded.*

Eggleston, Buchanan and Smith, JJ., dissenting.

Buchanan, J., dissenting.

Not only is the evidence in this case ample, as stated in the opinion, to justify the conclusion of the jury that Deal's death was caused by criminal violence. It is also ample to justify the conclusion of the jury that beyond any reasonable doubt Plymale, the defendant, was the author of the criminal violence, the perpetrator of the crime of killing Deal to get his money and then setting fire to the house to conceal his crime.

The fire was discovered about three-thirty in the morning in the living quarters of Deal, who was 76 years old and known to possess considerable money. All the occupants

of the building were aroused and escaped except Deal, who could not be aroused. He was already dead from multiple fractures of the skull and face, inflicted by some blunt instrument. The defendant said the blunt instrument was an iron bar which he had left stuck up in the chimney in Deal's room. He asked his brother-in-law, Rogers, to get it and hide it, because that was the only thing that would incriminate him in the killing of old man Deal. Rogers and Plymale's wife found the iron bar and hid it. The sheriff found it where Rogers said it was hidden.

Plymale was out of a job and out of money at the time of the killing. Immediately thereafter he was in funds and spending freely. About midnight of the third day after the fire he had Rogers drive him to an alley behind the Deal place. He explained that he had something up the alley that he wanted to get. He got into the car again a little later as Rogers slowed up at an appointed place. He asked Rogers to drive up a hollow and there he took a large sum of money out of his pocket, told Rogers to turn out his lights, then disappeared into the woods for some fifteen minutes. He told Rogers he had killed for this money once and would do the same for him if he told. A day or two later he told Rogers that he would not have set fire to the building if E. K. Bowen had not turned yellow on him; that they had planned to throw the body into the river, but after Bowen turned yellow he went over to the house and poured on some oil and stuff and set fire to it.

Unless he has not had the fair trial to which he was entitled under the law, the verdict of the jury, finding him guilty of first-degree murder and fixing his punishment at forty years in the penitentiary, and the judgment of the court approving it, ought not to be set aside.

It is said that the testimony of Sheriff Thompson and Deputy Fire Marshal Goode relating to accusations made by the sheriff to the defendant was hearsay and inadmissible.

"In civil and criminal cases, all objections to * * the admissibility of evidence * * shall state with reasonable

certainty the ground of objection, and unless it appears from the record to have been so stated, such objections will not be considered by this court except for good cause shown, or to enable this court to attain the ends of justice." Rule 1:8.

When the sheriff was called as a witness he was asked:

"Will you state to the Court and Jury what was said in the presence of the defendant and what he said to you?

"Mr. Collins [counsel for defendant]: We don't want the witness to state any hearsay evidence.

"The Court: If the statements were made in the presence of the defendant it is admissible or anything said by the defendant it is admissible.

"Mr. Collins: May we ask the Court on [sic] question.

"The Court: Mr. Thompson, don't give in your answers any hearsay testimony or any statement based on hearsay. You understand what I mean? Ask the question Mr. Stephenson."

No further objection and no exception was made to the testimony of the sheriff, who was fully examined and cross-examined. He related that he accused the defendant of murdering Deal and burning the building, showing him first the iron bar he murdered Deal with; accused him of not borrowing money from his brother-in-law to pay off a lien against his car, but attempting to establish an alibi; of telling the driver of the cab who had taken him to see E. K. Bowen that night to forget that he had seen him. The defendant was then sitting on a bench and at times held his head in his hands and at other times sat erect. The only thing the defendant said in response was that "he could not tell us anything." This occurred about eleven-thirty at night after defendant had been arrested.

The next morning at ten-thirty the sheriff walked into the defendant's cell, the floor of which "was literally covered with cigarette butts," and said to him, "you know everything I told you last night was so, and to this he said yes."

When the sheriff said on cross-examination that he assumed the defendant knew what he was talking about, the sheriff said also that he only talked to the defendant one time the night before.

When Goode was being examined he was asked what accusations were made in the defendant's presence and answered that the sheriff brought out the iron bar and told the defendant that was the bar he had killed Deal with and defendant made no reply. After the answer was made defendant's counsel said, "We object to this, it's hearsay all the way through." The court replied, "I don't think that is hearsay when he was right there. Objection overruled."

The defendant does not contend in his brief that this evidence from the sheriff and Goode should have been rejected because it was hearsay. He says it was inadmissible because the defendant was under arrest and that this court should adopt the rule of inadmissibility in that case followed by some courts, as pointed out in *Owens* v. *Commonwealth*, 186 Va. 689, 703, 43 S. E. (2d) 895, 901. In that case the defendant was not under arrest and we held that evidence that he remained silent when accused was admissible.

Not only was there no adequate objection to the testimony of the sheriff and Goode on the ground on which the defendant now claims it was inadmissible; but that testimony, if inadmissible to show a silent admission, became admissible as part of the vocal admission made by the defendant to the sheriff the following morning.

Under the circumstances shown by the record the admission of this testimony was not, in my opinion, error for which this case should be reversed.

The opinion states that an atmosphere most detrimental to the accused was created by asking him on cross-examination whether Sheriff Thompson, Rogers, Goode and another witness had "falsified." If proper objection had been made the court should and probably would have forbidden the question in that form because argumentative, but no objec-

was made and the experienced counsel for defendant may have had good reason for not objecting. There is not only no request for reversal but not even any complaint here on that score.

While the defendant assigns error to permitting the sheriff to remain in the courtroom "and have custody of the jury," the sheriff did not in fact have custody of the jury. This jury was not kept together, as permitted by Code § 19-188, and the record shows that at each adjournment or recess the jurors were instructed not to mention the case to anyone and not to allow anyone to mention the case to them. So far as the record shows this injunction was strictly obeyed. The court said it needed the sheriff in the conduct of the court. It was in the sound discretion of the court whether he should be excluded. Code, § 19-219; *Burford* v. *Commonwealth*, 179 Va. 752, 760-1, 20 S. E. (2d) 509, 512.

This sheriff had been in office some eight years and, of course, was known to the jurors. There is nothing in the record to indicate that his presence in the courtroom during the trial gave the jury any different impression of his attitude than his appearance and testimony on the witness stand alone would have done. It may be conceded that it would have been better under the circumstances to exclude him, but there is no showing of prejudicial error in allowing him to remain. *Campbell* v. *Commonwealth*, 194 Va. 825, 834, 75 S. E. (2d) 468, 474.

It cannot be questioned that it is a long established principle of our criminal law that every unlawful homicide is presumed to be murder in the second degree, and an instruction to that effect is usually necessary in a homicide case. But it is not always necessary. *Taylor* v. *Commonwealth*, 186 Va. 587, 591, 43 S. E. (2d) 906, 908. In criminal cases, as in others, instructions should be based on the evidence and the character of the evidence controls the character of the instructions. Here, according to the Commonwealth's evidence, the defendant admitted that he killed Deal for his money. That sort of killing is first-

degree murder, made so by statute, Code § 18-30, and no other degree is recognized or provided for. The defendant said he did not kill Deal for his money or any other reason. He was not there and had nothing to do with it, he said. There was no middle ground here. The evidence made a case of first-degree murder or no offense at all. The presumption of second-degree murder yields to facts. *Thomas* v. *Commonwealth*, 186 Va. 131, 138, 41 S. E. (2d) 476, 479. There is no room for the presumption where the facts are shown and where under the facts as shown there could be no question as to the degree of the murder if murder was committed. While the jury could have returned a verdict of second-degree murder in spite of the evidence, and nothing could have been done about it, it would have been an improper verdict and there was no reason in law or logic for the court to have suggested the propriety of that sort of verdict by giving Instruction H. *Bell* v. *Commonwealth*, 167 Va. 526, 541, 189 S. E. 441, 448.

It has been said that there is no such thing as a perfect trial. It may be conceded that this trial does not disprove that saying, but it presents evidence clearly sufficient to establish that this defendant committed a cruel and ruthless murder. His punishment was fixed in a trial in which, in my opinion, no substantial error was committed in prejudice of his legal rights. I think his conviction ought to be affirmed.

EGGLESTON and SMITH, JJ., join in this dissent.