# Richmond

## HENRY BOYD PAINTER v. COMMONWEALTH OF VIRGINIA.

December 1, 1969.

Record No. 7093.

Present, All the Justices.

*Humes J. Franklin, Jr. (Gordon W. Poindexter, Jr.,* on brief), for plaintiff in error.

*W. Luke Witt, Assistant Attorney General (Robert Y. Button, Attorney General; Reno S. Harp, III, Assistant Attorney General,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Henry Boyd Painter was convicted of the murder of his wife, Vallie Mae Simmons Painter, on May 1, 1968, and his punishment fixed at

fifty years confinement in the penitentiary. From the judgment of the lower court sentencing the accused in accordance with the jury verdict, we granted defendant a writ of error.

The questions pertinent to this decision concern the failure of the trial court to grant instructions on second degree murder and provocation. Defendant also complains of the actions of the trial court in refusing to admit certain medical evidence he alleges was consistent with his defense of provocation.

The facts are not in serious controversy. Defendant and his wife were married in September, 1960, and at the time of the homicide had three daughters, ages seven, six and five. The parties had experienced marital difficulties, and there was evidence that Mrs. Painter took trips to Atlantic City and Canada with another man prior to her separation from defendant.

On November 30, 1967, defendant suspected that his wife was out again with this same man. His testimony is that she arrived home about 11 P. M. and had been drinking. When he remonstrated with her she started cursing, and a fight ensued. Following this altercation, Mrs. Painter obtained a warrant for the arrest of defendant. She left their home on December 1, 1967 and moved to the home of her mother, taking the three children with her.

During the month of December, defendant had conferences with the Superintendent of Welfare of Waynesboro regarding his marital difficulties. He also conferred with his wife in regard to support. This was in the presence of an attorney. He stated that he talked to his wife over the phone about seeing the children, and on one occasion saw his oldest child at school. Apparently he had no other contact with his wife and children.

Prior to Christmas 1967, defendant purchased presents for the children and attempted to deliver them in person on Christmas Day. When defendant took the presents to the home of Mrs. Simmons, his mother-in-law, and asked if he could see his children, she called defendant's wife to the door. Painter testified that his wife told him that he was not going to see the children; and that he could put the presents on the porch and she would deliver them. He responded that he would take the presents back home and give them to the girls later. He also said that when he asked to see the children, his wife told him: "[H]ell no, I wasn't never going to see them no more, you no good son of a bitch."

Defendant then returned to his mother's home, where he spent the night. The evidence is that he was in a distraught condition, upset,

crying and sobbing. Members of his family testified that he sat up most of the night on a couch in the living room and that his sobbing was audible on the second floor of the house.

On the following morning, December 26th, Painter refused to eat breakfast and left the house upset and crying. He went to Waynesboro, allegedly to transact some business and run an errand for his mother. His testimony is that en route to Waynesboro he decided to stop by W. T. Grant Company, where his wife was employed, and ask her if she would bring the children up to his mother's house so that he could see them. He pulled in the parking lot and waited until his wife drove in. He testified that he asked his wife if "she would bring the babies to my mother's or up to the house in Stuart Draft after she got off of work so I could see them. I wanted to see them. She refused me". Defendant said his wife told him: "[H]ell no, you no good, low down, son of a bitch, you ain't never going to see them no more".

Defendant stated that he started his truck and drove off, but then, in his words: "I stopped my truck and got out of it with the shotgun, I don't know what happened. The next thing I knew I was with the police up there."

The homicide was witnessed by Louise Brown, who worked in the same shopping center as did Mrs. Painter. When Mrs. Brown drove up to the parking lot, she noticed defendant sitting in his truck and that Mrs. Painter was getting out of her car. She said that defendant had his window rolled down, and it seemed he was trying to talk to his wife. She said Mrs. Painter walked on and "did not pay no attention to him". Witness proceeded to park her vehicle beside Mrs. Painter's car, and in just a few seconds she heard a loud blast that sounded like a gunshot. She looked back and saw Mrs. Painter's body lying on the hard surface and defendant standing there with a gun. Witness then lay down in the seat for fear defendant might shoot toward her "because he knew that I had just pulled in there". When she looked up, she saw defendant raise the gun toward Mrs. Painter's body, and there was another shot. She estimated that defendant was from eight to ten feet from his wife at the time.

Melvin Adkins, also an employee of the W. T. Grant Company, upon hearing a report that a lady had been shot, went outside and saw Mrs. Painter lying face down on the hard surface. He testified that he saw defendant standing over by a truck; that defendant was holding a shotgun in his hand, which Adkins took from him; and

that they stood and waited there for the police to come. Defendant told Adkins that the person shot was his wife and that he killed her. The 12-gauge gun and shells used in the homicide were introduced in evidence. Mrs. Painter died as a result of gunshot wounds.

Here we have a homicide committed with a background of marital discord, resulting in the separation of the parties and the wife taking possession of their children.

During the 26 days they lived apart, defendant became very emotional and was constantly upset and nervous. The testimony is that he lost about fourteen pounds in weight, and his distress was manifested by vomiting and frequent spells of crying and sobbing. He would sit by the window hoping his wife would drive by and he could get a glimpse of the children.

The culmination approached on Christmas Day when he was unable to see his children or deliver the presents that he had purchased for them. If the evidence of the defense is to be believed, he remained awake sobbing the night of December 25th.

It was on the following morning, December 26th, when he again was rebuffed by his wife in his effort to see the children, that the homicide occurred.

The Commonwealth admits that provocation, if it is of sufficient severity, can be offered as an extenuating circumstance. However, it contends the evidence that Mrs. Painter used abusive language to her husband comes only from the defendant himself, and, in any event, that this was not new to Painter—"He had heard it all before."

It is true that words alone would not be sufficient provocation to excuse a murder. However, we are not dealing here with excuse of, or justification for, murder. We are concerned in this case only with the grade or degree of homicide, and whether the evidence was so clear and uncontroverted that only an instruction on first degree murder was proper; or, whether the evidence was such that the jury should have passed upon its sufficiency to establish the wilful, deliberate and premeditated character of defendant's act.

The indictment returned by the grand jury was in the short form as allowed by Code Section 19.1-166. It charged that defendant did feloniously and maliciously kill and murder his wife. Degrees of murder in Virginia are defined by Virginia Code Section 18.1-21 as follows: "Murder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, abduction as defined in § 18.1-

38, arson, rape, robbery or burglary is murder of the first degree. All other murder is murder of the second degree."

One of the earlier expressions by this court on the distinction between the two degrees of murder is found in *McDaniel* v. *The Commonwealth*, 77 Va. 281, 283, 284 (1883), where the court said:

"I proceed to state as briefly as I can some general doctrines of the law of homicide, which will, I think, materially assist us in arriving at a correct conclusion upon this point. Every homicide under our statute is *prima facie*, a case of murder in the second degree. And it is incumbent upon the commonwealth in a case like the present, where the offence was not committed by any of the specific means enumerated in the statute, that is 'by poison, lying in wait, imprisonment or starving, nor [*sic*] in the commission of or attempt to commit arson, rape, robbery or burglary,' in order to elevate it to murder in the first degree, to prove by evidence, either direct or circumstantial, beyond rational doubt, that the killing was 'wilful, deliberate and premeditated.' And on the other hand, the burden is upon the accused, if he would reduce the offence below murder in the second degree, to show the absence of malice and the other mitigating circumstances necessary for that purpose."

From *Bradshaw* v. *Commonwealth*, 174 Va. 391, 398, 401, 4 S.E. 2d 752, 755, 756 (1939), we quote from an opinion by Mr. Justice Holt, as follows:

" 'The test of murder is malice. Every malicious killing is murder either in the first or second degree—the former if deliberate and premeditated, and the latter if not. Furthermore, there is a *prima facie* presumption of malice arising from the mere fact of a homicide, but there is no presumption therefrom of deliberation and premeditation. That is merely another way of stating the familiar rule of law that every homicide is *prima facie* murder in the second degree, and that the burden is on the accused to reduce, and on the Commonwealth to elevate, the grade of the offense.' *Jacobs* v. *Commonwealth*, 132 Va. 681, 111 S. E. 90.

\* \* \*

" 'The determination of the grade or degree of homicide is a question for the jury.' 2 Michie on Homicide, p. 1388.

" 'The sufficiency of the evidence on one hand to establish the wilful, deliberate and premeditated character of the act, or, on the other, to rebut the presumption of malice, is generally a question which lies peculiarly within the province of the jury.' *Bryan v. Commonwealth*, 131 Va. 709, 109 S. E. 477.

" 'We have held in perfectly clear cases that the evidence was not sufficient to show malice, even where the jury had found to the contrary, but malice is a subjective condition of mind, discoverable only by words and conduct, and the significance of the words and conduct of an accused person, wherever there can be doubt about such significance, addresses itself peculiarly to the consideration of the jury.' *Jacobs* v. *Commonwealth*, supra."

In *Taylor* v. *Commonwealth*, 186 Va. 587, 591, 43 S. E. 2d 906, 908 (1947), we said:

"It is reversible error for the trial court to refuse to instruct the jury on the lesser offenses charged in the indictment if there is any evidence in the record tending to prove such lesser offenses. [Citing cases.]

"It is not reversible error for the trial court to refuse to instruct the jury on the lesser offenses charged in the indictment if the record contains no evidence tending to prove them. [Citing cases.]

"Notwithstanding the *obiter dicta* in several Virginia opinions, we have found no case in which this court has reversed the trial court solely on the ground that the jury were instructed on the lesser grade of offense included in the indictment where the only evidence in the record tended to prove a higher grade of crime charged."

In the brief filed on behalf of the Commonwealth, attention is invited to *Wooden* v. *Commonwealth*, 208 Va. 629, 159 S. E. 2d 623 (1968). There it was the contention of the Commonwealth that a man named Adams killed the victim Myers during the commission of a robbery and that Wooden was a principal in the second degree. We held that such a conclusion could lead to only one verdict—guilty of murder in the first degree. The statute so provides. It says in express terms that murder in the commission of, or attempt to commit, robbery, is murder of the first degree.

*Wooden* is of significance for it overruled *Plymale* v. *Commonwealth*, 195 Va. 582, 79 S. E. 2d 610 (1954) insofar as *Plymale* was

in conflict and adopted the views of the dissenting justices. This quotation from the dissenting opinion in *Plymale* becomes pertinent here:

> "It cannot be questioned that it is a long established principle of our criminal law that every unlawful homicide is presumed to be murder in the second degree, and an instruction to that effect is usually necessary in a homicide case. But it is not always necessary. *Taylor* v. *Commonwealth*, 186 Va. 587, 591, 43 S. E. (2d) 906, 908. In criminal cases, as in others, instructions should be based on the evidence and the character of the evidence controls the character of the instructions." 195 Va. 582, 601, 79 S. E. 2d 610, 620.

The Commonwealth contends here that there is not sufficient evidence on which to found an instruction of second degree murder or any other lesser degree of the crime of homicide; that Painter was not prejudiced because under an instruction given by the trial court the jury had to find that the killing was premeditated or they had to acquit; and further that this instruction placed an onerous burden on the Commonwealth, for had the jury not believed that premeditation existed, Painter would have walked out "scot free".

Admittedly, the instruction given by the trial court did place a heavy burden on the Commonwealth, and had the jury entertained a reasonable doubt that Painter acted with premeditation, they could have acquitted under it. However, it is doubtful under the facts in this case, and in view of defendant's failure to excuse or justify the killing, that the option to acquit or find a verdict of first degree murder posed a serious problem to the jury. Limited to these two possible verdicts, the one returned was predictable.

Under an indictment charging a malicious and felonious killing, the evidence showing the murder to have been deliberate, premeditated and wilful could be so clear and uncontroverted that a trial court could properly refuse to instruct on the lesser included offenses.

We do not think this to be such a case.

The theory of the Commonwealth is that the defendant armed himself with a gun, sought out his wife, and with little or no provocation, wilfully, deliberately and with premeditation murdered her. The jury was instructed as to first degree murder, and the fact that a mortal wound given with a deadly weapon in the previous posses-

sion of a slayer without provocation or slight provocation, is prima facie a wilful, deliberate and premeditated killing.

The defendant sought to reduce the degree of homicide. He showed the circumstances surrounding the shooting, the events that led up to it, his physical and emotional condition, and the acts and conduct of his wife that he considered as provocation. All were factors to be weighed by the jury in determining if the killing were wilful, deliberate and premeditated. The failure of the trial court to instruct on second degree murder and on provocation deprived the jury of a legal guide in making this determination.

> "The jury is not required to accept, *in toto*, either the theory of the Commonwealth or that of an accused. They have the right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true. In so doing, they have broad discretion in applying the law to the facts and in fixing the degree of guilt, if any, of a person charged with a crime." *Belton* v. *Commonwealth*, 200 Va. 5, 9, 104 S. E. 2d 1, 4 (1958).

It is defendant's theory that under the facts the jury could have found a lack of the premeditation necessary for first degree murder. There is some evidence in the record tending to support this theory, which, if believed by a jury, would warrant it in finding the accused guilty of second degree murder.

Hence we conclude that the court below committed reversible error in refusing to instruct the jury on the law of second degree murder and on provocation.

■ We find no error in the action of the trial court in refusing to admit certain medical evidence offered by the defendant. At the time this evidence was offered, counsel for the defendant explained:

> "Again for the purposes of the record, that we attempted to offer into evidence Dr. Garnett, Dr. Hill and Miss Scruggs' testimony as to Mr. Painter's, based on their examination of him, mental state and his mental makeup, as would have been on December 26th, the day of the shooting, with regard to whether or not this man might have premeditatedly, wilfully or deliberately killed this woman or whether he might have acted with or without malice. This is our theory of the case and this was our reason for offering this evidence for the jury."

It is nowhere contended that the defendant was not sane, did not know the consequences of his act or that he acted under an ir-

resistible impulse. Manifestly it would have invaded the province of the jury to have permitted the medical testimony offered by the defense. It was the responsibility of the jury to weigh and determine the facts, the provocation, great or small, and its effect, if any, on the defendant, and his premeditation of the homicide.

For the reasons stated, the judgment is reversed, and a new trial awarded the defendant.

*Reversed and remanded.*